IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ZURICH AMERICAN INSURANCE     )
COMPANY,                      )
                             )
            Plaintiff,        )
                             )
        v.                    )          1:18-CV-932
                             )
COVIL CORPORATION, et al.,    )
                             )
            Defendants.       )


**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

The plaintiff, Zurich American Insurance Company, initiated this declaratory

judgment action to determine its coverage obligations to its insured, defendant Covil

Corporation, in lawsuits and claims arising from Covil's sale or installation of asbestos-

containing materials.  Zurich named many defendants, including Covil; several other

insurance companies with potential coverage obligations to Covil; the estate of Franklin

Finch, which had obtained a judgment against Covil in a wrongful death case; and four

other estates or individuals with personal injury/wrongful death claims then pending

against Covil in North Carolina.

After various parties filed counter-claims, cross-claims, and third-party claims and

various parties settled, the Court questioned whether it had and should exercise subject

matter jurisdiction over some of the declaratory judgment claims, and the parties have

filed briefs.  Briefing has also been completed on summary judgment motions filed by

Zurich, United States Fidelity and Guaranty Company, Covil, and the individual defendants.

The parties present only one issue for declaratory judgment that is not hypothetical. As to that "allocation" issue arising in connection with the *Finch* judgment, a declaratory judgment will be entered in favor of USF&G and Zurich. As to all other issues presented, the Court declines to give an advisory opinion and declines to exercise subject matter jurisdiction. The remaining claims for declaratory judgment will be dismissed without prejudice.

## OVERVIEW

Zurich filed this case a few weeks after the estate of Franklin Finch and his widow, Ann Finch, obtained a multi-million-dollar verdict against Covil. *See generally Finch v. Covil Corp.*, 388 F. Supp. 3d 593 (M.D.N.C. 2019) (upholding jury verdict and denying Covil's post-trial motions). Zurich sued Mrs. Finch and four other individual defendants, who are the executors of the estates of four other asbestos claimants with suits against Covil filed in this state.[1] It also sued four insurance companies who had issued policies to Covil and who had potential or actual obligations related to the *Finch* judgment and other asbestos-related claims against Covil. The defendants answered; various cross-claims and counter-claims were asserted, and a third-party complaint was

---

[1] *Mullinax v. Advance Auto Parts, Inc.*, No. 1:16–cv–310 (W.D.N.C.); *Connor v. Norfolk S. Ry. Co.*, No. 1:17–cv–127 (M.D.N.C.); *Ellis v. Bridgestone Ams., Inc.*, No. 1:17–cv–942 (M.D.N.C.); and *Whitehead v. Air & Liquid Sys. Corp.*, No. 1:18–cv–91 (M.D.N.C.).

2

filed against two additional insurers; some claims settled; and some parties were dismissed.

In the pleadings, Zurich, other insurance companies, and Covil sought declaratory judgment as to coverage obligations of the insurance companies in three categories of cases: 1) the *Finch* case, where judgment has been entered against the insured; 2) the other individual defendants; and 3) other asbestos cases pending now or brought in the future against Covil. Zurich has since dismissed two of the individual defendants from the case, and no other party asserted a claim against them. Doc. 47 (dismissing Mullinax); Doc. 300 (dismissing Ellis). Summary judgment has also since been granted in Covil's favor in the lawsuits brought by the two remaining defendants, Connor and Whitehead.[2] Some of the claims and cross-claims between Covil and the insurance companies have been settled and those claims dismissed. *See* Docs. 328 (Hartford), 327 (Sentry), 297 (Penn National), 265 (TIG), 147, Minute Entry 11/14/2019 (Evanston).

Covil has also asserted several state law claims against Zurich and USF&G arising out of an alleged bad faith refusal to settle the *Finch* claim and breach of contract. Doc. 155 at ¶¶ 126–61. Discovery recently concluded on these claims, and summary judgment briefing is scheduled to occur this fall.

---

[2] *See* Memorandum Opinion and Order, *Whitehead v. Air & Liquid Sys. Corp.*, No. 1:18–cv–91, Doc. 355 (M.D.N.C. May 18, 2020) (granting summary judgment to all defendants remaining in the case); Memorandum Opinion and Order, *Connor v. Norfolk S. Ry. Co.*, No. 1:17–cv–127, Doc. 235 (M.D.N.C. Dec. 11, 2018) (same). Whitehead's and Connor's appeals are pending before the Fourth Circuit. *See* Notice of Docketing Record on Appeal, *Whitehead*, No. 1:18–cv–91, Doc. 360 (M.D.N.C. June 18, 2020); Notice of Docketing Record on Appeal, *Connor*, No. 1:17–cv–127, Doc. 239 (M.D.N.C. Jan. 4, 2019).

3

While the pleadings seek declaratory judgments as to many provisions of many policies, only four issues remain as a result of settlements and abandonment.[3]  Stated broadly, the declaratory judgment issues remaining for decision are:

1) The Aggregation Issue:  Whether coverage for certain bodily injury claims is available under the "operations" provision, which has only a per-occurrence limit of liability, or under the "products" or "completed operations" provisions, which together have an aggregate limit that caps all coverage once it is met, regardless of the number of occurrences.

2) The Allocation Issue:  Whether a judgment or settlement for an injury that occurred over multiple policy periods and uninsured periods is allocated proportionately among insurers and the insured, based on how much time each policy applied and how much time the insured was uninsured, or whether some other allocation is appropriate.

3) The USF&G Dates of Coverage Issue:  Whether USF&G provided general liability insurance policies to Covil from 1954 through 1964; and

---

[3] The summary judgment briefing did not address all declaratory judgment issues raised by the pleadings, and the Court directed all parties to submit proposed orders for all declaratory judgment claims they wanted decided, else the Court would consider them abandoned.  Doc. 285 at 3.  The parties' submission, Doc. 296, omitted several, such as Zurich's claim about coverage under its umbrella policies, Doc. 1 at ¶¶ 52–57, and Covil's claim about insurers' duty to defend.  Doc. 155 at ¶ 174(f).  While Covil initially sought declaratory judgments as to coverage under all of its insurance policies for the individual defendants in this case as well as "other underlying lawsuits," Doc. 155 at ¶¶ 124–25, 162–76, Covil has since contended that the Court does not have or should not exercise subject matter jurisdiction over some of the issues as to which it initially sought declaratory relief.  Doc. 256 at 1.

4

4) The Multi-Year/Annual Issue: Whether the limits—per person, per occurrence, and in the aggregate—in Zurich's primary policy apply once over each three-year policy period or annually.

## SUBJECT MATTER JURISDICTION

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Article III of the United States Constitution limits the federal judicial power to "cases" and "controversies."[4] Article III courts do not offer advisory opinions on "what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).[5] Persons seeking relief from federal courts must assert a concrete injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Courts wait until the case has "taken on fixed and final shape" so it is clear what legal issues the court is deciding and what effect the decision will have on the adversaries. *See Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952).

The Declaratory Judgment Act of 1934 respects these constitutional maxims by its terms. *See Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239–40 (1937);

---

[4] Article III § 2 provides in pertinent part: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; to all Cases affecting Ambassadors, other public Ministers and Consuls; to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States shall be a Party; to Controversies between two or more States; between a State and Citizens of another State; between Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

[5] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

5

*Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019). The Act provides, in relevant part, that, "[i]n a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (immaterial provisions omitted). As the Supreme Court explained in upholding the constitutionality of the Act against an Article III challenge, the phrase "case of actual controversy" in the Act means that it is "operative only in respect to controversies which are such in the constitutional sense." *Haworth*, 300 U.S. at 239–40; *accord MedImmune, Inc.*, 549 U.S. at 126–27; *see also Trustgard*, 942 F.3d at 199.

In other words, the Declaratory Judgment Act does not expand the jurisdiction of federal courts beyond that authorized by Article III; it provides federal courts with subject matter jurisdiction only to the extent "it authorizes relief which is consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Haworth*, 300 U.S. at 240. Even when there are many practical reasons an early determination of a legal issue would be helpful to litigants, "practical value cannot overcome this fundamental limitation on our jurisdiction." *Trustgard*, 942 F.3d at 201.

The Fourth Circuit has recently questioned whether subject matter jurisdiction can exist in a duty-to-indemnify declaratory judgment claim, absent a finding of underlying liability. *See id.* at 199–201 (noting and discussing "uncertainty" over this question); *id.* at 205 (Harris, J., concurring, discussing the "lack of clarity in the case law" on same issue). "[S]uits about the duty to indemnify—unlike the duty-to-defend suits—would

6

ordinarily be advisory when the insured's liability remains undetermined." *Id.* at 200. But courts have exercised jurisdiction without a finding of liability in many cases over the years, *see, e.g.*, *Gen. Ins. Co. of Am. v. U.S. Fire Ins. Co.*, 886 F.3d 346, 349, 355 (4th Cir. 2018) (with "many claims against WECCO [that] remain pending," court declared certain applicable policy limits); *In re Wallace & Gale Co.*, 385 F.3d 820, 823–24, 829 (4th Cir. 2004) (assessing "the rights of the insurance companies to have their obligations for payment ascertained" for intervenors who had "filed proofs of claim"), and the exact parameters of subject matter jurisdiction in this context remain unsettled.

If a declaratory judgment action raises a constitutional case or controversy, courts are not required to act; as has been clear for decades, federal trial courts still have discretion as to whether to declare the rights of litigants. *Brillhart v. Excess Ins. Co. of Am.,* 316 U.S. 491, 494–95 (1942); *accord MedImmune, Inc.*, 549 U.S. at 136; *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282–83 (1995). "The Declaratory Judgment Act provides that a court '*may* declare the rights and other legal relations of any interested party,' 28 U.S.C. § 2201(a) (emphasis added), not that it *must* do so." *MedImmune, Inc.*, 549 U.S. at 136; *accord Wilton*, 515 U.S. at 286–87 ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.").

Whether exercising this jurisdiction is appropriate depends on the trial court's "circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Wilton*, 515 U.S. at 287 (quoting *Wycoff*, 344 U.S. at 243). Put another way, "[i]n the declaratory judgment context, the normal

principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288; *accord Trustgard*, 942 F.3d at 201; *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990) (noting that before issuing declaratory relief, the court must undertake a "prudential inquiry" into whether such relief is appropriate).

In making this discretionary determination, federal district courts consider all relevant prudential factors to determine the fitness of the case for declaratory judgment resolution. *See Wilton*, 515 U.S. at 289 (noting that evaluating usefulness of declaratory judgment remedy is "peculiarly within the[] grasp" of district courts); *Brillhart*, 316 U.S. at 494–95 (identifying factors relevant in that case and noting that other cases might shed light on additional factors in a court's decision to stay or dismiss a declaratory judgment action); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (characterizing the decision of whether to exercise jurisdiction in a declaratory judgment action as a "prudential inquiry"). Speaking broadly, the Court is guided by "considerations of federalism, efficiency, and comity," *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422–23 (4th Cir. 1998), evaluated in light of "whether the declaratory relief sought: (1) 'will serve a useful purpose in clarifying and settling the legal relations in issue,' and (2) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* at 422–23 (quoting *Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321, 325 (1937)).

First, "courts should exercise their discretionary jurisdiction with caution when doing so would raise serious questions about Article III jurisdiction." *Trustgard*, 942

8

F.3d at 202. "The Fourth Circuit has a long history of reluctance when it comes to exercising jurisdiction over declaratory judgment actions involving the indemnification of parties to non-removable state court actions." *Am. Motorists Ins. Co. v. Commonwealth Med. Liab. Ins. Co.*, 306 F. Supp. 2d 576, 579–80 (E.D. Va. 2004) (collecting cases).[6]

Beyond this, and depending on the facts of the particular case, courts often consider whether there are pending state court proceedings involving the same parties and presenting issues of state law, *Ind-Com*, 139 F.3d at 423;[7] the scope of any pending state court proceedings, *Wilton*, 515 U.S. at 283; whether the lawsuit is a device for

---

[6]*See, e.g.*, *Mitcheson v. Harris,* 955 F.2d 235, 236, 238 (4th Cir. 1992) (reversing district court's decision to exercise jurisdiction over a declaratory judgment action brought by a liability insurance company when underlying personal injury case was pending in state court, noting that "[a]bsent a strong countervailing federal interest, the federal court . . . should not elbow its way into this controversy to render what may be an uncertain and ephemeral interpretation of state law."); *Indemnity Ins. Co. v. Schriefer,* 142 F.2d 851, 852 (4th Cir. 1944) (affirming dismissal of declaratory judgment action filed by an automobile insurance company against its insured seeking a declaration that the insurance company had no liability under its policy, when wrongful death suit was pending in state court); *Aetna Cas. & Sur. Co. v. Quarles,* 92 F.2d 321, 325 (4th Cir. 1937).

[7] "There is no requirement that a parallel proceeding be pending in state court before a federal court should decline to exercise jurisdiction over a declaratory judgment action. Rather, as the district court stated, '[t]he existence or nonexistence of a state court action is simply one consideration relevant to whether to grant declaratory relief.'" *Ind-Com*, 139 F.3d at 423. "[W]e do not seek to diminish the importance of a parallel state court proceeding in a district court's decision. Clearly, the existence of such a proceeding should be a significant factor in the district court's determination. But it is not dispositive. Rather, even in the absence of a state court proceeding, the criteria outlined in *Quarles,* as well as the considerations of federalism, efficiency, comity, and procedural 'fencing,' continue to be factors which the district court should balance when determining whether to assert jurisdiction over a declaratory judgment action." *Id.*

Case 1:18-cv-00932-CCE-LPA   Document 334   Filed 08/04/20   Page 9 of 29

"procedural fencing,"[8] *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 377 (4th Cir. 1994);[9] whether the declaratory judgment action will result in piecemeal resolution of controversies without settling the entire dispute, *Ind-Com*, 139 F.3d at 422; whether the declaration will interfere with another action, *id.*; and whether there are closely intertwined claims for non-declaratory relief also properly before the Court. *Gross*, 468 F.3d at 210; *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 466–67 (4th Cir. 2005).

If there is an ongoing proceeding in state court that overlaps with the federal case, courts must also consider whether "federalism, efficiency, and comity" counsel against exercising jurisdiction. *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004); *accord Trustgard*, 942 F.3d at 202. In making this determination, courts often look to the state's interest in having its own courts decide issues, *Trustgard*, 942 F.3d at 202, especially if the case implicates important issues of unclear state law, *Ind-Com*, 139 F.3d at 424; whether the state court can resolve the issues more efficiently than the federal courts, *Trustgard*, 942 F.3d at 202; whether the case raises the potential for unnecessary entanglement between the state and federal courts based on overlapping issues of fact or law, *id.*; and "whether the federal action is mere forum-shopping." *Id.*

---

[8] The Fourth Circuit has said that "procedural fencing" occurs when "a party has raced to federal court in an effort to get certain issues that are already pending before the state courts resolved first in a more favorable forum." *Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 212 (4th Cir. 2006).

[9] *Overruled on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).

10

# FACTS

For many years, Covil, a South Carolina corporation, sold and distributed insulation products that contained asbestos. *See, e.g.*, *Finch v. Covil Corp.*, 388 F. Supp. 3d 593, 599–600 (M.D.N.C. 2019).[10] Zurich issued insurance policies to Covil for the period beginning March 31, 1970, through March 31, 1976. Doc. 204. USF&G issued insurance policies to Covil for the period beginning March 31, 1976, through March 31, 1978. Doc. 205. Among other things, these polices provided commercial general liability (CGL) insurance.

Zurich, USF&G, and Covil have stipulated to the relevant terms of the policies, which are substantively identical across the USF&G and Zurich policies.[11] Docs. 204, 205-1, 332 (stipulations as to distinct policy limits); *see* Doc. 213 at 6 n.2 ("The USF&G and Zurich policies are essentially identical as respects the products and completed operations hazards."). No other party has provided contrary evidence. Hartford issued insurance policies to Covil arguably in effect from 1977 to 1986. Doc. 288-1 at 7; *see* note 14 *infra*. The record is silent as to any possible insurance policies issued after 1986, and the briefing makes it clear that the parties believe there are none. Covil ceased operations in 1991, and South Carolina administratively revoked its corporate charter in 1993. Doc. 210-2 at 5; Doc. 26-1 at 2.

---

[10] To the extent the facts in *Finch* relate to coverage, the Court will cite to the Court's decision on post-trial motions, which contains supporting citations to the record in that case.

[11] Because the policy language is identical, and in an effort to simplify at least one thing in this decision, all citations are to the USF&G policy.

Injured persons and their estates have brought personal injury suits against Covil in North and South Carolina relating to the distribution and/or installation of asbestos-containing products. *See* note 1 *supra* (listing some of the North Carolina cases); *see* discussion *infra* (as to South Carolina cases). It appears undisputed that for years Covil had no officers, directors, or employees capable of taking the actions required to obtain counsel or to file or defend any lawsuit and that, until the recent appointment of a Receiver, three of Covil's insurers—Zurich, Sentry Casualty Company, and USF&G—controlled Covil's defense in any underlying asbestos litigation. *See* Doc. 8 at 5–6; Doc. 25 at 2–3; Doc. 26 at 2; Doc. 41 at 1 (adopting Docs. 25 and 26).

In October 2018, after a five-day trial, a jury awarded $32,700,000 to one of the defendants here, Ann Finch, executor of the estate of Franklin Finch, in a wrongful death suit against Covil. *See* Final Judgment, *Finch v. BASF Catalysts LLC*, No. 1:16-cv-1077, Doc. 492 (M.D.N.C. Oct. 19, 2018).[12] The jury found that Mr. Finch's mesothelioma was caused by exposure to asbestos-containing insulation Covil sold for use during construction of a tire plant operated by Mr. Finch's employer. *See Finch*, 388 F. Supp. 3d at 599–606.

Soon after the *Finch* verdict, in one of the lawsuits against Covil in South Carolina state court, the plaintiffs moved for appointment of a receiver. *See* Doc. 8-1 at 2. On November 2, 2018, the state court appointed a receiver to administer Covil's assets. *See id.* at 2–4.

---

[12] After post-trial motions, the Court reduced the judgment to $30,353,285. *See* Final Amended Judgment, *Finch*, No. 1:16-cv-1077, Doc. 525.

12

Four days later, on November 6, 2018, Zurich brought this lawsuit in this Court against Covil, other insurers who may provide coverage to Covil, the Finch estate, and four other North Carolina citizens who at the time were claimants against Covil or the personal representatives of claimants in asbestos suits in North Carolina federal courts. Doc. 1. A multitude of coverage and bad faith lawsuits were soon thereafter initiated in various courts, some of which were removed to the United States District Court for the District of South Carolina. *See, e.g.*, Doc. 67 at 4–5; *Falls v. CBS Corp.*, No. 3:19-1948-BHH, 2019 WL 3387978, at *1 (D.S.C. July 26, 2019) (noting pendency of three declaratory judgment and insurance-related cases in that court).

The South Carolina Supreme Court has appointed former Chief Justice Jean Toal to serve as the Chief Judge of Administrative Purposes over all asbestosis and asbestos litigation in South Carolina state court, including cases against Covil. *See* Doc. 215-1 at 5. Many such cases against Covil are proceeding in South Carolina state court. *See, e.g.*, *Falls*, 2019 WL 3387978, at *1 (noting pendency of 25 actions against Covil as of July 26, 2019, and dismissing one case as improperly removed). The Receivership action also proceeds in front of Chief Judge Toal. *See, e.g.,* Doc. 8-1; Doc. 215-1; Doc. 288-1.

Also pending before Chief Judge Toal are two cases recently remanded by the United States District Court for the District of South Carolina. One involves Covil's claims of malpractice and breach of fiduciary duty against a South Carolina law firm and Covil's extracontractual claims against its insurers in connection with that law firm's work. *See* Complaint, *Protopapas v. Wall Templeton & Haldrup PA et al.*, No. 3:19-cv-01635-BHH, Doc. 1-2 at 4–27 (D.S.C. June 6, 2019). In the other, Mrs. Finch seeks a

13

declaratory judgment against certain Covil insurers that until November 2, 2018, they acted as Covil's alter ego, agency, or instrumentality. *See Finch v. Sentry Casualty Co.*, No. 3:19-cv-1827-BHH, Doc. 1-5 at 5–15 (D.S.C. June 27, 2019).

Before the recent remand of these two cases, the District Court in South Carolina enjoined the Receiver "from further pursuing judicial determinations in underlying state tort suits regarding insurance coverage issues arising from policies issued or allegedly issued to Covil by the Insurers." *Covil Corp. by Protopapas v. Zurich Am. Ins. Co.*, No. 7:18-3291-BHH, 2020 WL 951052, at *11–*12 (D.S.C. Feb. 27, 2020). But that court "decline[d] to issue a broad moratorium on further proceedings that implicate the Insurers in the Receivership Court" or to rule on whether the insurers had improperly withheld documents from the Receiver in underlying South Carolina state court actions. *Id.* In recent orders, Chief Judge Toal stated the court's intention "to faithfully adhere" to the rulings of the U.S. District Court in South Carolina and to "stay out of ruling on coverage matters that are before" that court. Doc. 288-1 at 5; Doc. 303-2 at 6.

The Court will address additional facts as needed in the context of the issues presented.

As the individual defendants adopt the positions of Covil in connection with the pending motions, *see* Docs. 214 (Covil's motion for summary judgment), 256 (subject matter jurisdiction), the Court will refer only to Covil's arguments, for simplicity.

## ANALYSIS

### I. The Finch Estate

#### A. Subject Matter Jurisdiction

14

The Court has subject matter jurisdiction to decide any declaratory judgment motions that affect coverage for or payment by the insurers of the *Finch* judgment. The evidence during the jury trial in *Finch* established when Mr. Finch was exposed to Covil asbestos, and the parties have stipulated when each policy was in effect. For coverage purposes, the *Finch* case has "taken on fixed and final shape," and the court can thus analyze the both the relevant legal issues and the effect that decision would have on the litigants. *Wycoff*, 344 U.S. at 244; *Trustgard*, 942 F.3d at 202.

This case also includes extracontractual claims brought by Covil against Zurich and USF&G for bad faith refusal to settle the *Finch* case. These claims involve assertions that the insurers did not meet their obligations under the insurance policies, which may require resolution of some of the same coverage issues involved in the declaratory judgment claims. This factor supports the exercise of jurisdiction to decide declaratory judgment issues raised by the *Finch* judgment. *See Gross*, 468 F.3d at 210.

The factors that would discourage exercising such jurisdiction do not come into play here. This Court determined liability in the Finch estate's underlying asbestos case, and there are no state court cases pending that raise the same coverage issues, so there is no state court litigation that would create federalism issues. As to coverage issues raised by the *Finch* judgment, Zurich did not engage in forum shopping by filing its case in this district because this Court had recently dealt with the *Finch* case. *See* Doc. 84 at 5–6.

## B. Facts

The evidence at the *Finch* trial established that Firestone built a tire manufacturing plant in Wilson, North Carolina, from 1973 to 1974. *Finch*, 388 F. Supp. 3d at 600–601.

15

It was virtually undisputed at trial that Covil sold all of the insulation used during the construction of the plant, that it was unlikely any asbestos-containing insulation had been added to the plant after its construction, and that, nearly fifteen years later, over 7,000 feet of asbestos-containing pipe insulation was removed from the press area during an abatement project at the plant. *Id.* at 600–602. There was no evidence that Covil sold or installed any asbestos-containing product in the plant after the factory was completed in 1974. *Id.* at 602.

Mr. Finch began working in the Firestone plant in 1975, after Covil's sales were completed, and he worked there until 1995. *Id*. at 604. On a daily basis, Mr. Finch worked on and around the tire presses in the curing room and the insulated steam pipes leading to and from the presses. *Id.* Many years later, at age 78 years, he was diagnosed with mesothelioma, and he died in January 2017, ten months after his diagnosis. *Id.* at 601; Third Amended Complaint, *Finch v. Covil Corp.*, No. 1:16-cv-1077, Doc. 150 at ¶ 2 (M.D.N.C. Dec. 13, 2017).

### C. Analysis

While the Court has jurisdiction to decide any declaratory judgment motions affecting coverage of the *Finch* judgment, three of the four issues presented for declaratory judgment will have no such impact. The multi-year/annual issue does not arise in the *Finch* case, which only involves one year of Zurich's coverage, and the question as to whether USF&G provided coverage back in 1954 to 1964 is irrelevant to *Finch*, as all asbestos exposure occurred years later. The aggregation issue arises only when operations coverage applies during the claimant's initial exposure, but as to the

16

*Finch* judgment, the parties agree that coverage exists under the products hazard provision, not the operations provision. Resolution of the allocation issue does affect the percentage of the *Finch* judgment each insurer must pay, and therefore the Court will issue a declaratory judgment as to the allocation issue.

### 1. Aggregation

The parties concur that in Section II, the CGL part of the policy, the insurer provides certain delineated coverage for "bodily injury" caused by an "occurrence" arising out of 1) Covil's ongoing operations; 2) Covil's completed operations; and 3) Covil's products. The parties agree that the *Finch* judgment is covered by the products provision. Doc. 295 at 3. They disagree about the application of aggregate limits when the "ongoing operations" provision is implicated for at least some of a claimant's injury.[13] As is obvious, then, the disagreement about aggregate limits for claims that have ongoing operations coverage has nothing to do with the *Finch* judgment. As such, the Court need not resolve it here.

The insurers contend that "[r]ulings on the aggregate issue will determine the amount prior settlement payments reduced the aggregate limits available for the *Finch* claim." Doc. 296 at 4 (citing Doc. 213 at 17 n.7). They also assert that money paid for the *Finch* claim will affect what is available for other claimants who are subject to the same aggregate limits. *See* Doc. 257 at 7. But in their briefing the insurers have not

---

[13] The parties have not concisely explained their differing views on this question, and the Court need not undertake the task. Essentially, it is the same question that arose in *In re Wallace & Gale Co.*, 385 F.3d at 833–35. Anyone interested can refer to the publicly filed briefs at Doc. 210 at 18–21; Doc. 213 at 4–5, 11–18; Doc. 251 at 8–16; Doc. 254 at 11–13.

17

pointed to any evidence showing that either has paid any money in any earlier settlements or how much, or which types of coverage are involved in other individuals' claims. Absent such evidence the question is hypothetical. The Court need not resolve the aggregation question here.

USF&G and Zurich also maintain that the aggregation issue affects the bad faith claims brought by Covil for failure to settle the *Finch* case, because application of prior payments toward aggregate limits would affect what was available to settle *Finch* before trial. But they have been non-committal on the facts that support this contention. And they have not provided any context to show that it will be necessary, as opposed to possibly necessary, to decide this coverage issue before resolving the bad faith claim. If it becomes necessary to resolve the aggregation issue in the course of resolving the bad faith claim, the Court will handle the question then, when it is no longer hypothetical.

To the extent the summary judgment motions are directed to the aggregation issue and the *Finch* judgment, the Court denies all motions and dismisses the claims without prejudice, as the aggregation issue is not raised by the *Finch* judgment.

### 2. Allocation

Zurich, USF&G, and Covil agree that each of the two insurers issued a policy that provides coverage for claims made by persons exposed to asbestos during the policy period or sold by Covil during the policy period, subject to disputed aggregate and per-occurrence limits. Doc. 295 at 1–2. They disagree on how to allocate responsibility between and among the insurers and Covil, given that at best Covil had coverage for these kinds of bodily injury claims only through 1986, and yet during those post-1986

18

years, persons were exposed to and injured by previously-sold-or-installed Covil asbestos.

The Zurich and USF&G policies cover bodily injury "which occurs during the policy period," subject to any applicable "occurrence" or "aggregate" limits. Doc. 295 at 2; Doc. 212-2 at 5 (Section G(2) of policy). The evidence during the *Finch* trial established that mesothelioma develops and causes bodily injury over time; that Mr. Finch was exposed to and was injured by Covil asbestos products between March 31, 1975, and March 31, 1976, when Zurich provided coverage, *see* Doc. 204, and again between March 31, 1976, and March 31, 1978, when USF&G provided coverage. Doc. 205. He continued to be exposed to and injured by Covil asbestos until 1989, when the plant undertook a major asbestos abatement program, *Finch*, 388 F. Supp. 3d at 600–601, years during which Covil had some potential coverage through Hartford until 1986[14] and thereafter had no insurance policy in place to cover asbestos-related bodily injury. Mr. Finch continued to be injured by the previously inhaled asbestos fibers until he died in 2017 from mesothelioma caused by the asbestos installed by Covil.

As between Covil, Zurich, and USF&G, Covil thus had relevant insurance coverage for only three of the 42 years during which Mr. Finch was injured by Covil asbestos products. *See* Doc. 204 at 2–3 (Zurich primary policy coverage from 3/31/1970 to 3/31/1973, 3/31/1973 to 3/31/1976); Doc. 205 at 2 (USF&G policy coverage from

---

[14] Hartford and Covil have settled. Under the terms of that settlement, approved by the court in South Carolina, Hartford paid a substantial sum of money to establish a Qualified Settlement Fund by "buying back" the insurance contracts it issued to Covil. Doc. 288-1 at 10. The effect of this settlement on any coverage issue is not before the Court.

19

3/31/1976 to 3/31/1978). The question arises: how to allocate a loss occurring over time and over multiple insurance policy periods and uninsured periods between and among the insurance companies and the insured?

Zurich and USF&G contend that they are liable for the proportion of the injury that occurred during the years they provided coverage. Relying on a South Carolina case that arose in the context of water damage to property occurring over time and over multiple policy periods, *see Crossmann Com'ties of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589 (S.C. 2011), the insurers assert that as to Mr. Finch, Zurich is responsible for no more than 1/42 of the judgment and that USF&G is responsible for no more than 2/42 of the judgment, both subject to policy limits.

Covil maintains that these insurers are responsible for all of Covil's asbestos liability and can each protect themselves by seeking contribution from other unspecified insurers. Here, that would mean USF&G and Zurich would have to pay for all policy periods during which Mr. Finch was injured from Covil asbestos he inhaled, even during years in which USF&G and Zurich did not provide coverage.

The Court is applying South Carolina law here, and the Supreme Court of South Carolina spoke directly to this situation—how to allocate a long-term loss over multiple insurance policy periods—in *Crossmann*. Crossmann, a developer, settled claims for damages arising from progressive water damage over time caused by Crossmann's negligent construction of condominiums. Over the period of damage, Crossmann had several successive insurance policies from different insurers. All the insurers but Harleysville settled, and Crossmann filed a declaratory judgment action to determine the

20

extent to which its policies with Harleysville provided coverage. Relying on similar policy language to that at issue here, the trial court held that Harleysville's liability was joint and several with other insurers, following *Century Indem. Co. v. Golden Hills Builders, Inc.*, 561 S.E.2d 355 (S.C. 2002).

Overruling *Century Indemnity*, the South Carolina Supreme Court held that Harleysville's liability was "limited to damages accrued during its 'time on the risk,'" *Crossmann*, 717 S.E.2d at 591, an approach that "best conforms to the terms of a standard CGL policy and to the parties' objectively reasonable expectations." *Id.* at 594. This allocation method "requires a policyholder to bear a pro rata portion of the loss corresponding to any portion of the progressive damage period during which the policyholder was not insured or purchased insufficient insurance." *Id.*

The *Crossmann* court provided a "default rule" for allocation between and among insurers and the insured "[i]n cases where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy." *Id.* at 602. Courts look "to the total loss incurred as a result of all of the property damage and then devise[] a formula to divide that loss in a manner that reasonably approximates the loss attributable to each policy period." *Id.*

> The basic formula consists of a numerator representing the number of years an insurer provided coverage and a denominator representing the total number of years during which the damage progressed. This fraction is multiplied by the total amount the policyholder has become liable to pay as damages for the entire progressive injury.

*Id.* This formula "assumes the damage occurred in equal portions during each year that it progressed." *Id.* When applied, "each triggered insurer is responsible for a share of the

21

total loss that is proportionate to its time on the risk." *Id.* If there is proof "showing that the damage progressed in some different way, then the allocation of losses would need to conform to that proof." *Id.*

Here, no party asserts that Mr. Finch's asbestos-related injury occurred unevenly over time. Applying the default formula in *Crossmann*, Zurich and USF&G are each liable for their pro rata share of the judgment, based on the number of years each provided coverage relative to the overall duration of the injury.

Mr. Finch's injuries began in 1975, when he began work at the tire plant in and around the asbestos installed by Covil. His injuries ended in 2017, when he died of mesothelioma caused by Covil asbestos. The overall duration of his injury was 42 years. Zurich had coverage for one of these years; even if Mr. Finch's exposure only lasted for three months of that policy, Covil was entitled to the full coverage limits of the policy for which it paid. USF&G had coverage for two of these years. Thus, 1/42 (2.38%) of the loss would be allocated to Zurich, and 2/42 (4.76%) of the loss to USF&G—up to per-occurrence and aggregate policy limits. Covil or its other insurers, if any, would then be responsible for "[t]he portion of the loss that exceeds the policy limit." *Id.* at 602 n.15.

Covil asserts that its insurers should effectively bear full liability for the entire judgment amount, up to their per-occurrence policy limits. In urging this interpretation, Covil first points to policy language very similar to that which was before the *Crossmann* court and essentially seeks to relitigate *Crossmann*. *Compare* Doc. 210 at 23, Doc. 204 at 56, 66 (policy language requiring the insurer to pay "all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage

22

to which this insurance applies . . .") *with Crossmann*, 717 F.2d at 595 (same, except referring to insurer's obligation to pay "those sums that the insured becomes legally obligated to pay"), 599 (treating policy language of "those sums" the same as "all sums"). This Court will not revisit the South Carolina Supreme Court's conclusion that this language does not dictate what is essentially a joint and several liability approach.

Second, Covil asserts that applying the default rule in *Crossmann* would be unfair here because Covil—as "a defunct company in receivership"—lacks funds to absorb any of its asbestos liability. Doc. 210 at 23. But the *Crossmann* court understood that an insured company might lack insurance for certain periods of time; rather than impose that financial risk on its insurers and then allow them to seek contribution from each other, the South Carolina Supreme Court explicitly gave the insured the "responsibility for whatever portion of the total loss is attributed to those uninsured years." 717 S.E.2d at 602 n.14. And while Covil is correct that *Crossmann* affords some flexibility to trial courts to modify the default formula, the flexibility applies to the formula itself, not the overall approach in allocating risk:

> [W]e emphasize that trial courts employing the "time on risk" approach may alter the default formula set forth above where a strict application would be unduly burdensome or otherwise inappropriate under the circumstances of a particular case. However, any such alterations must remain within the bounds of a pro rata/"time on risk" approach: the formula must result in a reasonable approximation of the amount of property damage that occurred during each insurer's policy period.

*Id.* at 602. The *Crossmann* court thus evaluated and rejected both Covil's reasons and its alternative method for departing from the default allocation rule.

23

Finally, at oral argument Covil contended that because Zurich and USF&G had essentially been operating as Covil for many years, they should pay Covil's share, since Covil did not otherwise exist. This argument depends on facts that are not before the Court and would appear to be part of a pending state court case raising the "alter ego" argument. *See Finch v. Sentry Casualty Co.*, No. 3:19-cv-1827-BHH, Doc. 1-5 at 5–15 (D.S.C. June 27, 2019). The Court expresses no opinion and makes no ruling on this question, which is beyond the scope of the declaratory judgment motions.

The insurers' motion for summary judgment will be granted on this claim as to the *Finch* judgment. The cross-motions by Covil and the individual defendants on this claim will be denied. A declaratory judgment will be entered separately.

### 3. Multi-Year/Annual

The multi-year/annual issue raises the question of whether Zurich's policy limits—per person, per occurrence, and in the aggregate—apply once over each three-year policy period or annually. No party has explained how resolution of this issue would have any impact at all on the *Finch* case, which only involves one year of Zurich's coverage, or provided any specific reason that resolution of this dispute is necessary to ascertain how Covil's insurers are responsible for the *Finch* judgment. Even if the policy limits apply only once per three-year period, Zurich has provided no evidence that it has paid out for other settlements or judgments that would reduce the amount available to Mrs. Finch. The Court need not decide this issue, as it has no apparent relevance to coverage of the *Finch* judgment. The cross-motions for summary judgment will be

denied and all claims, cross-claims, and counter-claims raising this question will be dismissed without prejudice.

### 4. USF&G Dates of Coverage

The question of whether USF&G covered Covil back in 1954 to 1964 is also irrelevant to *Finch*, where all exposure occurred years later. The Court need not decide this issue as to the *Finch* case. Covil's motion for summary judgment will be denied, and Covil's claim for declaratory judgment on this issue will be dismissed without prejudice.

## II. Whitehead and Connor

The insurance companies ask the Court to declare their duties to indemnify Covil in other cases brought against Covil by two individual defendants here. The lawsuits brought by these two remaining individual defendants, Whitehead and Connor, have been dismissed in Covil's favor. *See* note 2 *supra*. In the absence of a liability determination, subject matter jurisdiction is questionable. *See Trustgard*, 942 F.3d at 199–201.

Nor have the insurers shown that the declaratory judgment issues in this case have even hypothetical application to Covil's obligations in the underlying Whitehead and Connor cases, raising the risk of an advisory opinion. Despite opportunities, *see, e.g.*, Docs. 278, 285, neither insurer has pointed to any evidence showing when Mr. Connor or Mr. Whitehead were allegedly exposed to Covil's asbestos or for how long, or to evidence that USF&G or Zurich had a policy in place at a time that arguably provides coverage. Doc. 329 at 95 (agreement by Zurich's counsel that this evidence is not in the record). Zurich's annualized limit question, Doc. 208, and USF&G's coverage timeframe, Doc. 210 at 10, are only relevant for coverage provided in specific years. The

25

allocation question arises in the context of determining coverage for injuries occurring over time, and its application in a given case depends on facts absent on the record here, including the duration of exposure while Zurich and USF&G were "on the risk." And neither insurer has explained whether there are disputes in these two cases about whether the completed operations provision or the products provision applies, as in *Finch*, or whether operations coverage applies, so that the aggregation question is raised.

Zurich makes passing mention that resolution of the aggregation issues could affect its duty to defend these cases, so that resolution of that issue is appropriate under Article III. Doc. 257 at 17. Perhaps that is so, but it does not change the reality that Zurich has not presented this issue in any concrete way. Absent some firm evidence that resolution of the aggregation issue actually matters to a specific case, the Court declines to exercise its jurisdiction to decide it.

On this record, a declaratory judgment would not clarify and settle the legal relations between the insurance companies, Covil, and the individual defendants Whitehead and Connor. *See Ind-Com*, 139 F.3d at 422–23. Exercising subject matter jurisdiction, if it exists, over such hypothetical issues that may never arise is not appropriate. *See Trustgard*, 942 F.3d at 199–201. To the extent the cross-motions for summary judgment on these coverage issues are directed to these two cases, the motions will be denied and these claims dismissed without prejudice.

## III.    Everyone Else

The parties have provided no information about the other underlying asbestos cases in this and other states that the insurers contend will be affected by the coverage

26

issues subject to the pending requests for declaratory judgment. Many facts not in the record would determine which such issues would be raised in these underlying cases: for example, when the claimants were exposed to asbestos, whether any court has decided Covil's liability for such exposure, how the exposure occurred (and thus, which types of insurance coverage apply), and which of the several insurance companies who are or have been in this case would be responsible for this coverage. Without any of this information, the Court does not know whether these unspecified asbestos cases would require resolution of the coverage questions and would be issuing an advisory opinion if it were to decide these questions.

Just because the Court has subject matter jurisdiction and exercises it as to one question that matters between the litigants does not mean that the Court should decide all insurance coverage and policy interpretation questions between those litigants and the rest of the world. These questions are better addressed in the concrete, not the abstract.

There are other reasons to decline to exercise subject matter jurisdiction. Many of these cases are proceeding in South Carolina state court, where they present issues of state law and substantial state-wide management issues with which this Court does not want to interfere. *See Ind-Com*, 139 F.3d at 423; *Wilton*, 515 U.S. at 283. While procedural fencing in the way that term was defined in *Nautilus* does not appear to be occurring, *see Nautilus,* 15 F.3d at 377 (4th Cir. 1994), Zurich and USF&G have aggressively used and attempted to use federal litigation to undermine the South Carolina court's management of pending personal injury cases. Any declaratory judgment would result in piecemeal resolution of controversies without settling the entire dispute, *Ind-*

*Com*, 139 F.3d at 422, and potentially interfere with other actions where liability has not been determined. *Id.*

The Court declines to exercise subject matter jurisdiction to decide any of these coverage questions as to other unnamed asbestos claimants. The cross-motions for summary judgment will be denied and these claims dismissed without prejudice.

### IV. Other pending motions

Covil filed a motion to stay briefing on certain declaratory judgment issues, Doc. 221, so that South Carolina state courts could determine certain issues of South Carolina law. Doc. 222 at 1–2. Covil had already briefed these issues with its motion for summary judgment, Doc. 209, and the insurers have since responded. Doc. 254. In addition, the United States District Court for the District of South Carolina has enjoined the Receiver from raising these issues in South Carolina state court while federal cases raising the same coverage issues are pending. *See Covil Corp. by Protopapas*, 2020 WL 951052, at *11–12. The motion to stay will be denied as moot.

Covil has also filed a motion to seal, Doc. 252, and Sentry has filed a motion to dismiss. Doc. 301. These will be decided by separate order.

It is **ORDERED** that:

1. Covil's motion to stay, Doc. 221, will be **DENIED** as moot.

2. Zurich's declaratory judgment claim directed to annual/multi-year coverage limits is **DISMISSED without prejudice,** as the Court declines to exercise subject matter jurisdiction over this issue, and its motion for partial summary judgment, Doc. 206, is **DENIED as moot.**

28

3. Zurich and USF&G's motion for partial summary judgment, Doc. 211, is **GRANTED in part** on the allocation issue as applied to the *Finch* judgment, and a Declaratory Judgment will be entered separately as time permits. Zurich's declaratory judgment claims and USF&G's declaratory judgment cross-claims are otherwise **DISMISSED without prejudice,** as the Court declines to exercise subject matter jurisdiction over these issues.

4. Covil's motion for summary judgment, Doc. 209, is **DENIED in part** on the allocation issue as applied to the *Finch* judgment. Covil's declaratory judgment claims are otherwise **DISMISSED without prejudice,** as the Court declines to exercise subject matter jurisdiction.

5. The individual defendants' motion for summary judgment, Doc. 214, is **DENIED in part** on the allocation issue as applied to the *Finch* judgment and is otherwise **DENIED as moot**, as the Court declines to exercise subject matter jurisdiction over the remaining declaratory judgment issues.

This the 4th day of August, 2020.



UNITED STATES DISTRICT JUDGE