**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NUMBER: 1:18-CV-932**

COVIL CORPORATION, by and through its duly appointed receiver, Peter D. Protopapas,

*Plaintiff*,

vs.

UNITED STATES FIDELITY & GUARANTY COMPANY,

*Defendant*.

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNITED STATES FIDELITY AND GUARANTY COMPANY'S MOTIONS *IN LIMINE* TO EXCLUDE TESTIMONY OF COVIL'S EXPERT WITNESSES

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. SHARLA FROST'S TESTIMONY IS INADMISSIBLE .......... 2

A. Background .......... 4

B. Ms. Frost's Opinions Are Inadmissible Because They Fail To Satisfy *Daubert*'s "Fit" Requirement and Are Based on Improper Speculation .......... 7

1. Opinions Concerning The "Standard Of Care" .......... 8

2. Opinions Regarding Settlement Offers and Prospects .......... 10

3. Opinions Concerning Wall Templeton's Competence .......... 14

C. Ms. Frost Cannot Offer Opinions Beyond The Scope Of Her Report .......... 15

D. Ms. Frost's Testimony Is An Inadmissible Narrative Summation .......... 16

II. LINDA BARBER'S TESTIMONY IS INADMISSIBLE .......... 20

A. Ms. Barber's Narration Of Covil's Litigation History And The *Finch* Claim Is Not Admissible Expert Testimony .......... 22

B. Ms. Barber's "Claims Handling" Testimony Should Be Excluded .......... 24

C. Ms. Barber's Opinions Regarding USF&G's Purported "Failure To Follow Standard Practice" Should Be Excluded .......... 25

III. MICHELLE POTTER'S TESTIMONY IS INADMISSIBLE .......... 29

A. Ms. Potter's Conclusions Concerning USF&G's Purported Failure to Settle *Finch* Are Inadmissible .......... 31

B. Ms. Potter's Opinions Are Inadmissible Because They Fail To Satisfy *Daubert*'s "Fit" Requirement .......... 32

C. Ms. Potter's Opinions Concerning Her "Data Analysis" Of Asbestos Jury Verdicts Are Inadmissible .......... 33

D. Ms. Potter Should Be Precluded From Offering Opinions Concerning Dean Omar's Role as Trial Counsel ........................................ 37

E. The Data that Ms. Potter Relies Upon Is Inadmissible, Incomplete, and Unfairly Prejudicial ........................................ 41

CONCLUSION ........................................ 42

Pursuant to the Court's March 11, 2021 and March 26, 2021 Orders (ECF 388, 398), Defendant United States Fidelity and Guaranty Company ("USF&G") respectfully submits the following motions *in limine* to exclude the testimony of Sharla Frost, Linda Barber, and Michelle Potter under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## INTRODUCTION

"Expert testimony in the federal courts is governed by Federal Rule of Evidence 702." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018). Expert testimony is appropriate where (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re Lipitor*, 892 F.3d at 631. Where an expert witness is qualified by experience and does not apply a scientific method, "the district court must nonetheless require an experiential witness to explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).

The burden is on "[t]he proponent of the testimony [to] establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew*, Inc., 259 F.3d 194, 199 (4th Cir. 2001). In determining the admissibility of expert testimony, the Court "assumes a

'gatekeeping role' to ensure that [the expert's] 'testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Lipitor*, 892 F.3d at 631 (quoting *Daubert*, 509 U.S. at 597). Generally, "[a]n expert's testimony is admissible under Rule 702 if it 'rests on a reliable foundation and is relevant.'" *Deborah J. McDaniel, v. John Crane, Inc., et al.*, No. 1:19-CV-359, 2021 WL 1111154, at *4 (M.D.N.C. Mar. 23, 2021). The first prong of the inquiry requires "an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable"—in other words, "whether it is supported by adequate validation to render it trustworthy." *Id.* The second prong of the inquiry "requires an analysis of whether the opinion is relevant to the facts at issue." *Id.* Requiring the proponent of expert testimony to establish reliability and relevance before admitting such testimony is particularly important because expert testimony "can be very powerful before a jury." *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 676 (M.D.N.C. 2003).

For the reasons set forth below, the proposed testimony of each of the three experts proffered by Covil should be excluded at the trial of this action, because their opinions do not meet the threshold requirements for admissibility of expert opinion testimony set forth in Federal Rule of Evidence 702 and in *Daubert* and its progeny.

## ARGUMENT

### I. SHARLA FROST'S TESTIMONY IS INADMISSIBLE

Sharla Frost, an attorney who has represented defendants in asbestos litigation, offers the opinions that (i) "any reasonable litigant, or insurer on its behalf, would have taken all steps possible to contain the verdict risk presented by [the *Finch*] case" and (ii)

"[t]he insurance companies . . . failed to appropriately assess the trial risk, and once the case proceeded to trial, failed to take the necessary steps to protect Covil from what the insurers recognized would be a significant verdict." Ex. 1, (S. Frost July 10, 2020 Expert Report) ("Frost Report"). The Frost Report summarizes the *Finch* trial and opines in conclusory terms, largely without citation, that the *Finch* plaintiffs' case was compelling, their counsel was formidable, Covil's defense counsel was ineffective, and, based on this, the insurers supposedly acted "unreasonably" and "fell short of the standard of care" by not making a pretrial offer of "seven figures or slightly less."

Ms. Frost's testimony is inadmissible for multiple reasons. First, her Report is merely an argumentative selective narrative summation of aspects of Covil's case, from which Ms. Frost draws simple inferences or unsupported, *ipse dixit* conclusions. This is not proper expert testimony. Second, there is a lack of "fit" between Ms. Frost's opinions and Covil's claims. Ms. Frost entirely ignores the amount of USF&G's remaining policy limits, and simply asserts that USF&G should have made an opening counteroffer at or near $1 million. By simply assessing in hindsight the purported strength of the claims in *Finch* and ignoring the central issue of the amount of available insurance, Ms. Frost answers a question that is not posed by this case. Ms. Frost's criticisms of Covil's defense counsel and defense strategy are similarly off the mark. This is not a legal malpractice case, nor would a conclusion that Covil's defense counsel's trial performance was ineffective give rise to liability on the part of USF&G. Admitting this testimony into evidence would only serve to confuse the jury. So would admitting Ms. Frost's conclusory opinions that USF&G failed to act "reasonably" or "prudently" and fell below an

unspecified "standard of care" that does not comport with the standard for bad faith liability under applicable North Carolina law.

### A. Background

Ms. Frost was asked to "render an opinion … whether a reasonable litigant or insurer would have chosen to settle or proceed to verdict in the matter of Ann Finch, individually and as Executrix of the Estate of Franklin Delenor Finch v. Covil Corporation in 2018." Frost Rpt. at 5. Ms. Frost concludes that "any reasonable litigant" would have taken "all possible steps" to settle. *Id.* She bases her opinions on her experience in defending and settling asbestos personal injury cases and her review of certain deposition transcripts, transcripts of the *Finch* trial, certain expert reports, and a set of 182 documents produced by USF&G, Zurich, and Sentry selected for her review by Covil's counsel. *Id.* at 2–5.

The bulk of the Frost Report is a series of argumentative summary narrations of different facets of the *Finch* trial. Ms. Frost first summarizes Franklin Finch's medical treatment and testimony and concludes without citation that "the medical course described for Mr. Finch was more extensive than is ordinarily the case in a mesothelioma case" such that "[a]nyone with experience in asbestos litigation and the development of a damage model for the case could have anticipated that a jury would award significant damages for the pain and suffering portion of a verdict." Frost Rpt. 6–7. She then describes Mr. Finch's family relationships, stating in conclusory fashion that these relationships were "predictive of a large monetary award," *id.* at 7–9, and asserts without elaboration that "[n]either trial counsel nor the insurers viewed the court as a favorable one." *Id.* at 9.

Ms. Frost next presents her opinion of the Dean Omar firm:

> Jessica Dean … has a reputation for being a convincing advocate and can develop a strong rapport with jurors, particularly with female jurors. She and the firm are known quantities who constitute an enhanced verdict risk in cases they take to trial. Any litigant or insurance professional with experience in asbestos litigation should have recognized the risk of an out-sized verdict with Ms. Dean heading the trial team.
>
> On the other hand, the Dean Omar firm also has a reputation for being canny business people. They will resolve cases when there is a financial incentive to do so. However, they also will go to verdict even in cases where they expect to lose, just to make a point to their opponent.

Frost Rpt. at 9. Based on this and her review of correspondence from the Dean Omar firm, Ms. Frost expresses the opinions that "[Dean Omar] would likely have settled the case in advance of trial for whatever amount constituted policy limits for the claimed injury," and that "[i]nsurers['] refusal to provide [ ] information [about insurance coverage] and attempt to avoid the anticipated jury verdict was unreasonable." *Id.* at 10.

Ms. Frost then turns to Covil and its defense counsel, asserting that she "ha[s] concluded that the evidence proves" that Covil supplied asbestos-containing insulation for the plant where Mr. Finch worked; that defense counsel presented "minimal evidence" to support Covil's defenses; and that the testimony presented by plaintiffs "was sufficient to support a jury submission." Frost Rpt. at 10–11. Ms. Frost criticizes defense counsel's experience, opening statement, and expert witness strategy, concluding in summary fashion that these "made a liability finding against Covil almost a given." *Id.* at 11–13.

The next section of Ms. Frost's Report identifies what Ms. Frost claims are "three major opportunities for the insurers to settle the case" before trial—a September 2018

mediation; the week before trial; and during trial when the Court asked for a settlement update. Frost Rpt. at 13. Ms. Frost states that "[f]or this portion of the analysis, I set aside the question of the quantum of coverage available and the identification of the insurer or insurers whose policies were implicated, as those issues are beyond the scope of my assignment and my expertise." *Id.* Yet she also asserts that "[t]he testimony and the correspondence [of Dean Omar attorneys] imply that the case could have been settled" in February 2018 "for the policy limit if the insurers had provided written confirmation of those limits." *Id.* at 13–14.

With regard to the September mediation, Ms. Frost asserts that "[a]n offer of seven figures or slightly less . . . would have precipitated a legitimate discussion of a potential settlement and the avoidance of a trial" and by not making such an offer, the insurers "failed to reasonably protect the interests of their insured." Frost Rpt. at 14–16. Next, Ms. Frost asserts that "[t]he failure to tender an amount commensurate with the verdict risk" in response to a pre-trial demand of "more than $1,000,000" was "not reasonable." *Id.* at 15. Then, Ms. Frost claims that further increased settlement offers should have been made after the second day of trial and during jury deliberations. *Id.* at 16. Ms. Frost concludes by stating that failing to take the above steps "was unwarranted and deviated from both ordinary case handling and prudent business practice," and therefore "[t]he insurers fell short of the standard of care in handling the settlement negotiations on behalf of Covil in the Finch case." *Id.* at 17.

### B. <u>Ms. Frost's Opinions Are Inadmissible Because They Fail To Satisfy *Daubert*'s "Fit" Requirement and Are Based on Improper Speculation</u>

Ms. Frost's opinions are also inadmissible because they fail *Daubert*'s "fit" requirement, which requires that expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995); *see also Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 772 (D. Md. 2002), *aff'd*, 78 F. App'x 292 (4th Cir. 2003) ("The second question is whether it will help the trier of fact, which is generally a question of relevance, or 'fit:' assuming the evidence is reliable, does it apply to the facts in the individual case under consideration.") (citing *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000)); *McDaniel*, 2021 WL 1111154, at *4 (explaining that "[a]n expert's testimony is admissible under Rule 702 if it 'rests on a reliable foundation *and is relevant*,'" noting that this "inquiry requires an analysis of whether the opinion is relevant to the facts at issue.") (emphasis added). This "fit" requirement is more stringent than the relevancy requirement of Rule 402 "[b]ecause the jury will often have "difficulty . . . evaluating [expert] testimony," and therefore "expert witnesses have the potential to 'be both powerful and quite misleading.'" *Page v. Supervalu, Inc.*, No. WGC–14–1508, 2015 WL 1439572, at *9 (D. Md. Mar. 26, 2015) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

Here, Covil must show more than that USF&G failed to obtain a settlement of the *Finch* action. When determining whether an insurer improperly failed to settle a claim, the insurer's conduct may not be evaluated retrospectively. *See Coca-Cola Bottling Co. of Asheville, N.C. v. Maryland Cas. Co.*, 325 F. Supp. 204, 206 (W.D.N.C. 1971). Bad faith

cannot be found unless the jury determines that the insurer "acts with wrongful or fraudulent purpose." *Id.* at 206. "There is no liability for bad faith refusal to settle where there is an honest disagreement." *DENC, LLC v. Philadelphia Indem. Ins. Co.,* 426 F. Supp. 3d 151, 154 (M.D.N.C. Dec. 5, 2019).

Moreover, while "insurers have a 'duty to consider settlement of the claim in good faith,' they do not have 'a duty to settle every claim." *Id.* at 158 (quoting *Blis Day Spa, LLC v. Hartford Ins. Grp.,* 427 F. Supp. 2d 621, 635-36 (W.D.N.C. 2006). Under common law and statute, bad faith requires more than a mere failure to settle within policy limits and a verdict exceeding those limits. *See Coca-Cola Bottling Co.*, 325 F. Supp. at 206-07; *Thomas v. Nationwide Mutual Ins. Co.*, 277 N.C. 329, 332 (1970); *see also Blis Day Spa*, 427 F. Supp. 2d at 635-36. And as particularly relevant here, an insurer has no legal obligation to make a settlement offer or to settle a claim for amounts that are greater than the limits of its policy. Thus, it cannot be bad faith for any failure to do so.

As discussed further below, because Ms. Frost's opinions speak to questions that the jury will not be asked to decide under these governing legal standards, they fail to fit Covil's claims, would be unhelpful to the jury, risk creating unnecessary confusion, and would be unduly prejudicial.

### 1. Opinions Concerning The "Standard Of Care"

Ms. Frost claims that she was retained "to provide an expert report regarding the ***standard of care*** for an insurance company evaluating and resolving a mesothelioma death case and whether the insurers met ***that standard*** in their handling of the settlement negotiations in the Finch v. Covil matter." Frost Rpt. at 1 (emphasis added). Yet Ms.

Frost's Report does not mention a "standard of care" again until its last sentence, which asserts that "[t]he insurers fell short of the standard of care in handling the settlement negotiations on behalf of Covil in the Finch case." *Id.* at 17. Ms. Frost thus does not explain what "standard of care" she applies, beyond conclusory appeals to reasonableness and "prudent business practices." *See id.* Ms. Frost—who does not purport to be an insurance expert and disclaimed any consideration of an insurer-specific "standard of care"—thus appears to be opining on whether an attorney or business person would be considered negligent had they handled the *Finch* settlement negotiations in the manner in which Ms. Frost presents them. *See* Ex. 2, Frost Dec. 22, 2020 Tr. at 142:4-144:25 (disclaiming any expertise regarding insurance matters and asserting that "[a]s it relates specifically to insurance companies, I do not view that they have any different or lesser obligation to analyze and resolve these cases than does any other entity").

This opinion, again, fails *Daubert*'s "fit" requirement both because (i) as noted above, Ms. Frost ignores the question of USF&G's policy limits in evaluating the possibility of settlement and (ii) liability in this case is not premised on a negligence-based "standard of care," but instead requires evidence of intentional wrongdoing, with a wrongful or fraudulent purpose. *See, e.g.*, *Coca-Cola Bottling Co.*, 325 F. Supp. at 206. As above, admitting this opinion testimony would wrongly suggest to the jury that USF&G could be held liable for deviating from some unspecified norm of "prudent business practice," rather than for committing bad faith failure to settle under applicable North Carolina law. Such testimony should be excluded under Fed. R. Evid. 403 and 702.

This testimony is also subject to exclusion because "[c]onclusory testimony, for example, that 'a company engaged in "discrimination," that a landlord was "negligent," or that an investment house engaged in a "fraudulent and manipulative scheme" involves the use of terms with considerable legal baggage, . . . nearly always invades the province of the jury,' and should usually be excluded." *Georges v. Dominion Payroll Servs., LLC*, No. 3:16CV777, 2018 WL 2088751, at *3 (E.D. Va. May 4, 2018) (quoting *United States v. Perkins*, 470 F.3d 150, 158 (4th Cir. 2006)); *see also In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 629 (S.D.W.Va. 2013) (excluding expert testimony that products were "'not reasonably safe' or that [the manufacturer] 'failed to warn'" as impermissible legal conclusions). Ms. Frost's conclusory and unsupported statements regarding the "standard of care" and USF&G's failure to satisfy it are similarly inadmissible. *See, e.g.*, *Watson v. Farmers Ins. Co.*, No. 12–CV–391–JED–PJC, 2014 WL 2457243, at *4 (N.D. Okla. June 2, 2014) (noting that "to the extent [an expert] proposes to testify regarding the 'standard of care' applicable to a UM adjuster's conduct in this case, that may invade the province of this Court to instruct the jury on governing law," and "[t]o the extent that the expert would opine as to whether Farmers' conduct in handling plaintiff's UM claim was reasonable, that may not be helpful to a jury, where the jury (with proper instructions on the law) 'is capable of assessing for itself' whether or not Farmers' actions constituted bad faith").

**2. Opinions Regarding Settlement Offers and Prospects**

Ms. Frost's opinions concerning whether USF&G, either alone or with Zurich, had an opportunity to settle *Finch* should similarly be excluded. Ms. Frost admits she has no

expertise in insurance, and that she assessed potential settlement scenarios in *Finch* without regard to USF&G's policy limits. Indeed, Ms. Frost's Report expressly states that "[f]or th[e] portion of the analysis [concerning settlement prospects in *Finch*], I set aside the question of the quantum of coverage available and the identification of the insurer or insurers whose policies were implicated, as those issues are beyond the scope of my assignment and my expertise." Frost Rpt. at 13.[1] Yet this case specifically concerns whether "USF&G acted in bad faith and breached its contractual duty to settle *within the policy limits*." ECF 373 at 1.[2]

Ms. Frost's opinions regarding the feasibility of settlement simply "set aside" this central issue and instead seek to answer the irrelevant question of what a purported reasonable settlement offer would have been irrespective of any policy limits. Ms. Frost thus speculates, with no basis in the record, that "[a]n offer of seven figures or slightly less" at the September 2018 mediation "would have precipitated a legitimate discussion of a potential settlement and the avoidance of a trial," suggesting that any "legitimate" settlement would necessarily have been in excess of this initial counter-offer. Frost Rpt. at

[1] *See also* Ex. 3, Frost Aug. 6, 2020 Tr. at 14:14-25 (conceding no expertise in the fields of "insurance claims practice," "insurance policies and procedures," or "insurance industry custom and standard"); *id.* at 17:2–5 ("Q. You also hold no opinions as to the available coverage in the USF&G policy for Covil during the Finch trial? A. That is correct."); *id.* at 76:17–20 ("Q. … You're not offering any opinions as to the available coverage for settlement of the Finch matter, correct? A. That is correct."); *id.* at 79:12–19 (disclaiming any opinion on whether there were "any obligations on any individual insurer to gather and provide available limit information as to other insurers with respect to the *Finch* matter"); *id.* at 84:14–85:3 (stating that review of testimony by insurer representatives was "part of the evaluation of the coverage issue, and … outside the scope of my assignment").

[2] *See* fn. 1*, supra.*

17. Yet even the amount Ms. Frost hypothesizes would have been a "legitimate" opening offer is well in excess of USF&G's policy limits, either alone or combined with Zurich's limits. *See* ECF 332 (stipulating that USF&G's policy limits were $300,000 and Zurich's were $250,000).

Ms. Frost's opinions do not fit the relevant standards for imposition of bad faith liability. Whether or not Ms. Frost believes that USF&G could have settled for an amount that is greater than policy limits or that it should have caused defense counsel to offer such amounts is, by definition, irrelevant to Covil's claims. Given that an insurer has no obligation to offer or pay more than its policy limits, allowing Ms. Frost to opine on settlement strategy as if USF&G's policy limits were irrelevant and USF&G had the obligation to make settlement offers in excess of policy limits would not be helpful to the trier of fact and would create confusion and prejudice. Ms. Frost's opinions regarding settlement fail *Daubert*'s "fit" requirement and must therefore be excluded under Fed. R. Evid. 403 and 702.

*Modern Automotive Network, LLC v. Eastern Alliance Insurance Co.*, 416 F. Supp. 3d 529 (M.D.N.C. 2019), *aff'd*, 842 F. Appx. 847 (4th Cir. 2021), is instructive in this regard. In *Modern Automotive Network*, an insurance bad faith and UDTPA case involving a workers' compensation claim, the plaintiff proffered an attorney with expertise in workers' compensation litigation to offer opinions regarding claim valuation and settlement strategy. 416 F. Supp. 3d at 537. Like Ms. Frost, the attorney "ma[de] clear that he is not an expert on insurance claims handling" or insurance bad faith. *Id.* at 538. The insurer moved to exclude this testimony and the court granted the motion, reasoning

that the attorney's "opinions on [] claim valuation seem to be inextricably linked to his opinions regarding the reasonableness of how [the insurer] handled [the] claim," and thus it was "unclear how [the attorney's] experience led to certain conclusions reached in light of his lack of experience in insurance claim handling." *Id.* On appeal, the Fourth Circuit affirmed. *See* 842 F. Appx. at 849 (finding no abuse of discretion in exclusion based, *inter alia*, on expert's "conce[ssion] that he … had no experience with insurance claims handling," which was "relevant to this insurance coverage dispute"). This same logic applies here. Opinions concerning claim valuation and settlement strategy cannot be offered without considering the insurance coverage limits available to Covil. As a result, Ms. Frost's opinions regarding settlement, which purport to "set aside" all facts as to available limits, fail *Daubert*'s "fit" requirement and must therefore be excluded under Fed. R. Evid. 403 and 702.

Additionally, Ms. Frost's opinions about whether it would have been "reasonable" for Covil's insurers to make additional settlement offers glosses over whether or not the *Finch* action would have been resolved had they done so, and whether the failure to settle was motivated by the type of fraudulent and outrageous conduct necessary to support Covil's bad faith claims. To the extent Ms. Frost is attempting to get into the minds of Finch's trial counsel and what Ms. Frost believes they might have accepted in settlement, those opinions are inadmissible as they are based on pure speculation that does not satisfy the requirements of *Daubert* and Rule 702. Expert testimony "must not be based on belief or speculation, and inferences must be derived using scientific or other valid methods;" "it is not enough for an expert to rely on his subjective belief." *Small v. WellDyne, Inc.*, 927

F.3d 169, 177 (4th Cir. 2019) (quoting *Oglesby v. General Motors Corp.*, 190 F.3d 244 (4th Cir. 1999)). Here, the jury will hear from Ms. Dean, Mr. Branham, and Covil's defense counsel themselves about what was communicated during the course of settlement negotiations. Ms. Frost's conjecture as to what might have happened had different offers been made is the very type of speculation that is impermissible under Rule 702.

### 3. Opinions Concerning Wall Templeton's Competence

Ms. Frost should be precluded from offering opinions concerning the selection of Wall Templeton as Covil's defense counsel, the experience and skills of the Wall Templeton lawyers who handled *Finch*, their formulation and execution of Covil's defense strategy in *Finch*, their performance in defending Covil in the pretrial and trial phases of *Finch*, and related opinions. *See* Frost Rpt. at 11–13; Ex. 3, Aug. 6, 2020 Frost Tr. at 58:11-16; Dec. 22, 2020 Frost Tr. at 167:9–20; 168:21–169:11; 171:20–172:15. As discussed in USF&G's Motion *in Limine* No. 9, filed concurrently herewith, issues relating to Wall Templeton are not relevant to USF&G's potential liability to Covil. The performance of Covil's defense counsel is irrelevant to the question of whether USF&G refused in bad faith to settle Finch's claims against Covil.

Expert testimony that does not speak clearly and directly to a relevant issue is not admissible under Fed. R. Evid. 702 and should also be excluded under Fed. R. Evid. 403. Otherwise, its admission would confuse the jury by implying that USF&G could be held liable based on the jury's conclusions as to Wall Templeton's performance as defense counsel. *See, e.g.*, *United States v. Alvarado*, 808 F.3d 474, 495 n.14 (11th Cir. 2015) (affirming exclusion of testimony concerning "compliance with agency best practices"

because the legal standard did not turn on compliance with best practices and the testimony "would have potentially misled the jury, wasted time, and caused undue delay, in violation of [Fed. R. Evid.] 403"); *Doe v. Bd. of Cty. Comm'rs of Payne Cty., Okla.*, 613 F. App'x 743, 746 (10th Cir. 2015) (same). Therefore, Ms. Frost's opinions regarding Wall Templeton's abilities must be excluded.

In addition, these opinions are outside the scope of the alleged bad faith conduct described in Covil's tentative and final proposed verdict sheets filed on April 17, 2020 and August 10, 2020, respectively (*see* ECF 293-1; 338-1), and are thus deemed abandoned (*see* ECF 284 at ¶ 14). Because Covil failed to raise in its proposed verdict sheets any claims or issues concerning Wall Templeton's competence and trial performance—and such issues not otherwise having any apparent relevance to whether USF&G acted in bad faith in not settling *Finch*—USF&G did not designate an expert witness to testify about Wall Templeton's competence and trial performance. Covil should not be permitted to present such expert testimony now.

**C. <u>Ms. Frost Cannot Offer Opinions Beyond The Scope Of Her Report</u>**

In her deposition in a separate action pending in South Carolina, in which she relied on the same expert report, Ms. Frost also testified as to irrelevant and prejudicial matters such as the credibility, state of mind, or personal dispositions of witnesses. *E.g.*, Dec. 22, 2020 Frost Tr. at 250:24-251:4 ("I thought it was incredibly inappropriate in the era of Me Too for someone to be making, some male person to be making those sorts of comments concerning the people involved in this relationship and including expletives in the email traffic."); *see also id.* at 284:14-285:6 (suggesting that certain emails were "a testosterone

interaction" and "inappropriate in a business setting."). This, of course, is not proper expert testimony. *See, e.g.*, *Kremsky v. Kremsky,* No. 16-cv-4474, 2017 WL 663091, at *4 (E.D. Pa. Feb. 17, 2017) (expert's "attempt to opine on . . . state of mind is not permitted under Rule 702"); *In re Rezulin Prods. Liability Litig.,* 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). In any event, such testimony would be inadmissible here because it is beyond the scope of her Report. "The United States Court of Appeals for the Fourth Circuit and the district courts in this circuit are clear that an expert report should be a comprehensive document that, by itself, provides all the expert's opinions that will be offered at trial, along with the bases for those opinions." *Samsung Elecs. Co. v. Nvidia Corp.*, 314 F.R.D. 190, 198 (E.D. Va. 2016) (citing *Campbell v. United States*, 470 Fed. Appx. 153 (4th Cir. 2012)). Thus, "notice in deposition testimony does not render a failure to disclose in the expert report unsurprising or curable, even when that deposition testimony completely covers the material that should have been disclosed." *Id.* (collecting cases). To the extent the Court finds any aspect of Ms. Frost's proffered testimony admissible (and for the reasons set forth herein, it should not), her testimony should be strictly limited to any admissible opinions properly disclosed in her Report.

### D. <u>Ms. Frost's Testimony Is An Inadmissible Narrative Summation</u>

Courts recognize that allowing an expert to provide testimony "based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself." *United States v. Vance*, No. 07-CR-0351, 2011 WL 2633842, at *5 (N.D.

Ill. July 5, 2011) (citing *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996)) ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."). In other words, expert witnesses are not permitted to "merely summarize[] the evidence of record, without providing any specialized analysis." *Kennedy v. Joy Techs, Inc.*, 269 Fed. App'x 302, 312 (4th Cir. 2008).

The bulk of the Frost Report is merely an argumentative summation of the facts of the *Finch* case, including unsupported statements praising plaintiffs' counsel based on their "reputation" and criticisms of defense counsel. Ms. Frost opined that the forum and judge were important considerations for settlement, but did not do "any independent research concerning" the Court and instead merely asserted that the defense viewed the forum as unfavorable. Dec. 22, 2020 Frost Tr. at 155:21–156:12; *see also* Aug. 6, 2020 Frost Tr. at 64:13-66:25; *id.* at 65:10–13 ("I did not do a specific data search for verdicts in North Carolina, either plaintiff or defendant."). Nor did Ms. Frost attempt to assess the case or its settlement value using the information available to the parties prior to trial, instead relying extensively on materials dating from or after the trial, including trial transcripts, depositions taken in this action in 2020, and other materials such as the South Carolina state court's January 8, 2020 sanctions order, which Ms. Frost says she found relevant because it helped her understand "the significance of the trial threat from the plaintiff's firm" and "provided additional insight into the capabilities and tenaciousness for lack of a better term of plaintiff's counsel." *See* Frost Rpt. at 3–4 (listing materials reviewed by Ms.

Frost in creating her report); *see also* Aug. 6, 2020 Frost Tr. at 11:10-12:19; Dec. 22, 2020 Frost Tr. at 147:19–21; 149:9–12.

Thus, the Frost Report merely summarizes cherry-picked evidence, draws argumentative inferences from that evidence, and then states—based on nothing more than generic appeals to her experience as an attorney—conclusions along the lines of those Covil's counsel can be expected to ask the jury to reach in closing argument. This is not admissible expert testimony. *See Doe v. Ortho-Clinical Diagnostics*, Inc., 440 F. Supp. 2d 465, 470–71 (M.D.N.C. 2006) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert," and "bold statement[s] of the experts' qualifications, conclusions, and assurances of reliability are not enough"); *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 149 n.40 (S.D.N.Y. 2015) (Expert opinions that "[e]ssentially . . . summarize[] a number of internal [documents] that appear to have been hand-picked by Plaintiffs' counsel" in order to "devise[ ] a narrative" do not pass muster.). *Imperial Trading Co. v. Travelers Property Casualty Co. of America*, a ruling excluding proffered expert testimony in the context of another insurance bad faith claim, is particularly instructive in this regard:

> This Court's review of the report indicates that most of the proffered opinions are nothing more than a series of conclusory statements supporting plaintiffs' view of the factual and legal issues in this case. These conclusions do not reflect the application of technical expertise. The report reads more like a closing statement delivered by a trial attorney than a technical analysis provided by an expert witness. Most of Mr. Knowe's conclusions are unmoored to any analysis or method, and his report sheds woefully little light on why the jury should accept

> his conclusions. It also offers numerous commonplace observations, such as that the insurer must inform the insured why it is denying a claim, or that it must adjust all claims presented. These observations are well within the comprehension of the average juror and will not provide any assistance in understanding the facts at issue.

654 F. Supp. 2d 518, 521–22 (E.D. La. 2009). The same is true here, and warrants exclusion of Ms. Frost's testimony.

Exclusion is also appropriate because "an expert witness may not simply summarize the out-of-court statements of others as [her] testimony" and thereby act as a conduit through which inadmissible evidence, such as hearsay and matters subject to exclusion under Fed. R. Evid. 403, is disclosed to the jury. *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014). The underlying evidence must instead be admitted subject to all the relevant rules of evidence, and may then be summarized by counsel during closing arguments. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 499 (S.D.N.Y. 2009) ("Although a party might prefer to introduce a substantial body of documentary evidence through the direct testimony of a friendly expert, when those documents can be understood by a layman, they may be organized and summarized only during summation."). Here, if Ms. Frost is permitted to present her narrative of the *Finch* settlement negotiations and trial to the jury, her testimony will function as a backdoor for presentation to the jury of inadmissible evidence such as out-of-court testimony of the *Finch* plaintiffs and their counsel, made all the more improper by Ms. Frost's embedded, *ipse dixit* determinations as to credibility and weight of evidence, such as her assertion that

Ms. Finch's trial testimony was "compelling." Frost Rpt. at 7.[3] *See, e.g.*, *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) ("While an expert may rely on hearsay in forming [her] opinion, [she] may not 'simply transmit that hearsay to the jury' to prove the truth of the matter asserted."); *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 570 (E.D. Tex. 2014) ("Although expert witnesses are permitted to rely on hearsay to form their opinions, 'their testimony is not a vehicle by which evidence that is otherwise inadmissible may be introduced.'").

## II. LINDA BARBER'S TESTIMONY IS INADMISSIBLE

Linda Barber is an attorney who worked at insurance companies between 1981 and 1998 and since 1998 has worked in litigation consulting. Ms. Barber's expert report dated July 10, 2020 (Ex. 4, L. Barber July 10, 2020 Export Report) ("Barber Report") purports to opine on "the custom and practice within the insurance industry as to how liability insurers provide a defense to asbestos claims and how asbestos claims are resolved," and specifically "whether the handling of the Finch claim comported with industry practice."[4] Covil asserts that Ms. Barber will provide testimony regarding:

> [1] management of property and casualty claims and complex litigation related matters at issue in this case, including the duty to defend, and the duties of an insurer when the allegations of a complaint establish a potential for coverage, including when

---

[3] *See also, e.g.*, Dec. 22, 2020 Frost Tr. at 38:5-39:18, 146:2-21, 181:11-18, 186:16-187:2, 211:5-11, 214:24-215:7 (testimony that Ms. Frost is basing her opinions on Ms. Dean's and Mr. Branham's deposition testimony and conversations she had with Mr. Branham).

[4] Ms. Barber also submitted a report dated January 10, 2020 in the coverage phase of this case, addressing the classification of asbestos claims as product claims or operations claims. The opinions expressed in that report are irrelevant to Covil's bad faith claims.

> an insurer admits that a policy was issued, but policy provisions are missing[;]
>
> [2] the insurers' failure to follow the standard practice of insurance claims handling in the Finch case, including their decision to take the case to verdict even though Covil was the sole remaining defendant and lacked a strong defense at trial[; and]
>
> [3] USF&G's decision not to make a good faith effort to respond to plaintiff's settlement demand.

Ex. 5, Pl.'s Trial Witness List (Supp.) at 4.

Ms. Barber's proffered testimony suffers from most of the same defects as Ms. Frost's, and is inadmissible for many of the same reasons. ***First***, the Barber Report consists in substantial part of a narrative recitation of the history of asbestos litigation against Covil and the handling of the *Finch* claim, based on Ms. Barber's review of four deposition transcripts and 37 documents selected by Covil's counsel. As with Ms. Frost, this argumentative narration is not proper expert testimony. ***Second***, Ms. Barber's cursory, general assertions regarding claims handling procedures have no relevance and will not assist the jury in determining whether USF&G engaged in bad faith. And, while Covil's witness list asserts that Ms. Barber will testify regarding "the duties of an insurer when the allegations of a complaint establish a potential for coverage, including when an insurer admits that a policy was issued, but policy provisions are missing," this topic is wholly absent from the Barber Report and thus any such testimony would be inadmissible. ***Third***, Ms. Barber's assertions regarding USF&G's purported "failure to follow the standard practice" are conclusory and unreliable. Ms. Barber's testimony should be excluded in its entirety.

### A. Ms. Barber's Narration Of Covil's Litigation History And The *Finch* Claim Is Not Admissible Expert Testimony

Ms. Barber's 10-page Report consists of (i) three paragraphs describing asbestos claim handling procedures at a very high level of generality (Barber Rpt. ¶¶ 1–3); (ii) two paragraphs summarizing Covil's asbestos litigation pre-*Finch* (*id.* ¶¶ 4–5); (iii) six paragraphs discussing *Finch* (*id.* ¶¶ 6–11); and (iv) three concluding paragraphs that can broadly be characterized as analysis of the foregoing (*id.* ¶¶ 12–14).

As with Ms. Frost, there is no basis to admit Ms. Barber's summary narrative of Covil's asbestos litigation as relevant and reliable expert testimony. Ms. Barber merely summarizes the limited set of documents and testimony she reviewed and adds limited color commentary. *See, e.g.*, Barber Rpt. ¶ 7 ("Despite Mr. White's years of successfully defending Covil, his experience, and reputation, Travelers abruptly dismissed Covil's long-time counsel in April 2018…"); *id.* ¶ 10 ("Prior to the Finch trial, insurers were advised that the Finch case against Covil presented a significant threat."). To the extent the documentary and testimonial evidence underlying these statements is relevant and admissible, Covil can present it to the jury in the ordinary course. Covil, however, is not entitled to present expert testimony merely to organize this evidence and improve it via argumentative characterizations; the jury can decide on its own whether, for instance, USF&G's "dismiss[al]" of Covil's prior counsel was "abrupt[ ]" or whether the cited documents establish that *Finch* was a "significant threat." *See supra* p. 16–17, 19.

Moreover, the extremely limited nature of the materials Ms. Barber reviewed in constructing these narratives demonstrates their unreliability. Ms. Barber reviewed 37

documents and four deposition transcripts—those of Mr. Branham, Ms. Dean, Mr. Silverman, and Mr. White—and saw no need to consider testimony from the insurers themselves. *See* Ex. 6, Barber Tr. at 35:8–12 ("Q. Did you not think that it would be relevant to your expert opinion to consider any testimony provided by any of the employees of those carriers? A. Well, I did not need their testimony to reach my conclusion…"). Ms. Barber's extremely limited review of case materials is insufficient to allow her to authoritatively recount the history of Covil asbestos claims, the *Finch* litigation, and USF&G's involvement therein in a manner that would help, rather than confuse and mislead, the jury. Although flaws in an expert's methodology may be subject to cross examination in appropriate cases, consistent with the Court's role as gatekeeper, the Court should preclude this testimony because Ms. Barber's review here was so limited and one-sided that they render her opinions fundamentally flawed and unreliable.

In addition, to the extent the cursory asides in Ms. Barber's Report denigrating the Wall Templeton attorney who represented Covil in *Finch* (Barber Rpt. ¶¶ 8, 14; Barber Tr. at 145:5–146:17; 149:17–151:20) are being offered as "opinions," they should also be excluded for substantially the same reasons as Ms. Frost's opinions on this same topic. Any questions about the competence of William Silverman or Mark Wall is outside the scope of the alleged issues described in Covil's final proposed verdict sheet filed on August 10, 2020 and is thus abandoned, and Wall Templeton's performance is irrelevant to USF&G's liability. *See supra* pp. 14-15. Moreover, Ms. Barber did not even review the *Finch* trial transcripts to assess Wall Templeton's performance; instead, she testified that Covil's counsel verbally read to her selective quotes from the trial over the telephone. *See*

Barber Tr. at 146:23–149:16. Thus, even if Wall Templeton's competence in defending Covil was a relevant and proper subject of expert testimony, Ms. Barber's unreliable opinions on the matter would still fall far short of the bar for admissibility.

### B. Ms. Barber's "Claims Handling" Testimony Should Be Excluded

Covil asserts that Ms. Barber will testify regarding "management of property and casualty claims and complex litigation related matters at issue in this case, including the duty to defend, and the duties of an insurer when the allegations of a complaint establish a potential for coverage, including when an insurer admits that a policy was issued, but policy provisions are missing." Pl.'s Trial Witness List (Supp.) at 4. Ms. Barber's Report contains no admissible opinion testimony in this regard. It merely recounts, at an extremely high level of generality, the basic propositions that (i) "most asbestos claims [can] be resolved for relatively small payments" but in some more serious cases "substantial settlements were necessary to avoid multi-million-dollar verdicts" (Barber Rpt. ¶ 1) and (ii) insurers developed claim departments for handling asbestos claims with their own policies, procedures, and reporting structures. *Id.* ¶ 2. The Report then asserts in conclusory fashion that "[w]hen dealing with potentially catastrophic claims, claim handlers are responsible for protecting the policyholder from verdicts in excess of applicable policy limits." *Id.* ¶ 3.

This vague and generic testimony is inadmissible. The basic background facts about asbestos claims handling are irrelevant to USF&G's liability, and the assertion that claim handlers "are responsible for protecting the policyholder from verdicts in excess of applicable policy limits" is both a conclusory, *ipse dixit* opinion and one that misstates the

law, in that it suggests an unqualified obligation to "protect[] the policyholder" irrespective of whether a settlement can be reached within policy limits. *See, e.g.*, *Abernethy*, 373 F.2d at 568 ("an insurer, in the exercise of its contract right to effect settlement … is required to act diligently and in good faith in effecting settlements *within policy limits*") (emphasis added).

Covil also asserts that Ms. Barber will testify to "the duties of an insurer when the allegations of a complaint establish a potential for coverage, including when an insurer admits that a policy was issued, but policy provisions are missing." Pl.'s Trial Witness List (Supp.) at 4. Expert testimony on this topic has no clear relevance to any issue to be decided at trial, and to the extent relevant would improperly invade the province of the Court to instruct the jury as to the parties' legal duties. *See supra* at p. 10. But even if such testimony could potentially be admissible, it must be excluded because the Barber Report says nothing about this topic. As explained above (*see supra* at p. 16), "[t]he United States Court of Appeals for the Fourth Circuit and the district courts in this circuit are clear that an expert report should be a comprehensive document that, by itself, provides all the expert's opinions that will be offered at trial, along with the bases for those opinions." *Samsung*, 314 F.R.D. at 198 (citing *Campbell*, 470 Fed. Appx. 153). The fact that this topic is not discussed at all in the Barber Report makes it inadmissible at trial. *Id.*

### C. Ms. Barber's Opinions Regarding USF&G's Purported "Failure To Follow Standard Practice" Should Be Excluded

Ms. Barber further opines that "[s]tandard procedure is to make a good faith effort to resolve the claim and advise other insurers on the risk (such as excess insurers) that their

coverage could be impacted," but "there is no evidence" that USF&G "made a reasonable effort to settle [*Finch*]," or advised excess carriers of the potential for a "verdict impacting their excess coverage," and thus USF&G's "handling of the *Finch* claim is contrary to the standard practice of asbestos claim handling by insurers." Barber Rpt. ¶¶ 12–14. These opinions are presented without meaningful elaboration and fail to establish how Ms. Barber's "experience is reliably applied to the facts." *Wilson*, 484 F.3d at 274; *see also McDaniel*, 2021 WL 1111154, at *7 ("Although an expert's experience and training 'is useful as a guide to interpreting . . . facts, . . . it is not a substitute for them.'") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). Moreover, even if assessing the record evidence and drawing conclusions therefrom were an admissible expert methodology, Ms. Barber's failure to review anything close to the full record and to instead rely on four deposition transcripts and 37 cherry-picked documents dooms her conclusions that there is "no evidence" of certain occurrences, as well as the opinions she attempts to derive from such conclusions. *See, e.g.*, *Adkins*, 307 F.R.D. at 149 n.40 ("it is a stretch to describe" the task of summarizing documents "hand-picked by Plaintiffs' counsel" as "a methodology"); *United States v. Redlightning*, 624 F.3d 1090, 1112 (9th Cir. 2010) (rejecting expert who "testified that his expertise is 'driven by empirical research'" but actually "relied on statements made to him by counsel").

For example, Ms. Barber asserted in her Report that Covil's excess insurer, Ranger, was not advised of the risk presented by *Finch*, and relied on this claim to support her opinion that "standard procedure" was not followed. *See* Barber Rpt. ¶¶ 12–13. Yet at her deposition, Ms. Barber conceded that she did not review documents showing that Ranger

was, in fact, in communication with USF&G and plaintiff's counsel with respect to *Finch*. *See* Barber Tr. at 132:6-138:5; *id.* at 136:11–13 (conceding that "there clearly were communications, and . . . Ranger was in the loop"). And, as noted above, Ms. Barber made no effort to understand the insurers' side of the story before reaching her conclusions, asserting that she "did not need their testimony to reach my conclusion." *Id.* at 35:11–12. Having reviewed only a small subset of the record evidence, Ms. Barber is in no position to determine that there is "no evidence" of any particular fact or circumstance, much less to draw reliable conclusions from that determination.

Ms. Barber also supports her conclusion that USF&G acted unreasonably or contrary to standard practice with the contention "it was the responsibility of [USF&G] and Ranger to attempt to resolve the case" using funds allegedly proffered by Zurich, but USF&G did not do so. Barber Rpt. ¶ 13. Yet far from this reflecting the application of any sort of expertise, when questioned as to the basis for this contention, Ms. Barber merely stated that this was USF&G's and Ranger's responsibility "[b]ecause they were … the other carriers who had coverage for Covil." Barber Tr. at 161:20–25. This assertion thus does not reflect the application of any specialized knowledge with respect to allocation of responsibilities among primary insurers, between primary and excess insurers, or any other issue specific to the insurance industry generally or asbestos claims handling in particular. It is merely Ms. Barber's inference from the asserted fact that Zurich proffered certain funds to the other insurers on the day of the *Finch* verdict. The jury is equally capable of drawing this same inference, to the extent relevant. Presenting it via expert testimony is unhelpful and likely to exert undue influence by the jury, who will be led to believe that

there is something more to it. It is for this reason that "expert testimony is not permitted if it consists of drawing simple inferences from uncomplicated facts that serve only to buttress [a party's] theory of the case." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09–290, 2012 WL 6562221, at *16 (W.D. Pa. Dec. 15, 2012) (quotation omitted); *see also Dunn*, 275 F. Supp. 2d at 676 (noting that admissibility of expert testimony must be carefully controlled because it "can be very powerful before a jury").

Finally, Ms. Barber's testimony regarding "standard practices" and USF&G's compliance therewith should be excluded because Ms. Barber never articulates the content of these asserted "standard practices" or "procedures" with any specificity, and instead relies on conclusory and question-begging assertions that an insurer has a duty to "make a reasonable effort"; to "protect [its] policyholder"; and to make a "good faith effort" to settle. Barber Rpt. ¶¶ 13–14.[5] By framing "standard practices" at such a high level of generality, Ms. Barber is able to assert in circular fashion effectively that USF&G's conduct was unreasonable because USF&G did not act reasonably. This is a pure *ipse dixit* assertion that cannot be admitted as reliable expert opinion testimony. *See Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) (noting that "expert opinion testimony

[5] Where Ms. Barber does attempt to elaborate on what these standard practices and procedures actually are, she reverts to matters of pure procedure, such as the assignment of particular claims to particular claims handlers and their reporting and documentation obligations. *See* Barber Rpt. ¶ 2; Barber Tr. at 39:16–40:12 (describing "basic practices with respect to claims handling" in terms of the claim being "entered into a system," "assigned," "investigated," and so forth). But Ms. Barber never connects these assertions about the procedural aspects of claims processing and management to the substantive conclusions she draws about USF&G's conduct, nor does she account for the fact that different insurance companies have different policies, practices, and procedures with respect to documenting and handling claims. *See, e.g.*, *id.* at 37:5–41:5.

can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"). Ms. Barber's opinions that USF&G did not make an effort to settle in "good faith" are still more objectionable because, in the context of a bad faith failure to settle claim, such an opinion is, in essence, a direct instruction to the jury to find USF&G liable. *See, e.g.*, *Lamar Advert. Co. v. Zurich Am. Ins. Co.*, No. 18-1060-JWD-RLB, 2021 WL 1345708, at *6 (M.D. La. Apr. 12, 2021) (because "whether Zurich was in bad faith as contended by Lamar or acted reasonably and in good faith, as maintained by Zurich, is a question to be decided by the jury," expert could not opine on whether "Zurich acted reasonably and in good faith"). In sum, none of Ms. Barber's opinions are admissible at trial and her testimony should be excluded under Fed. R. Evid. 403 and 702.

## III. MICHELLE POTTER'S TESTIMONY IS INADMISSIBLE

Michelle Potter, a litigation consultant with the firm KCIC who focuses on asbestos litigation, offers the opinions that "USF&G failed timely to settle the Finch case when presented with the opportunity to do so," and that it "should, and could have, quickly ascertained the seriousness of the case." Ex. 7, (M. Potter July 10, 2020 Export Report) ("Potter Report"). She bases this opinion on "risk factors" that purportedly made the *Finch* case more "risky" and "serious" than other mesothelioma cases. Those factors are (1) the case was filed in North Carolina; (2) the number of defendants in the original *Finch* complaint is fewer than the national average; and (3) the Dean Omar firm represented the *Finch* plaintiffs.

Ms. Potter's testimony is inadmissible for multiple reasons. First, she has no training or expertise in any relevant specialized field, including insurance claims handling

or asbestos litigation defense. Even if she were qualified to offer opinions on such topics, however, she did not perform any analysis or review of the record reflecting USF&G's efforts to settle *Finch*, and her testimony that USF&G had an opportunity to settle the case, or should have taken it more seriously or made more diligent efforts to settle is without basis, not based upon any reliable methodology, and nothing more than her own speculation.

Ms. Potter's purported "data analysis" of the risks arising from the case being venued in North Carolina and the number of defendants named in the complaint does not employ any accepted methodology that has been or can be tested, rendering such testimony inadmissible under Rule 702 and the established *Daubert* factors for determining whether an expert's methodology is valid. *See Daubert*, 509 U.S. at 592–94.

Ms. Potter's purported "statistical" conclusions about the Dean Omar law firm are also inadmissible. Ms. Potter, who lacks any background or training in statistical analysis, admittedly did not apply any statistical methods or standards in performing her work. Instead, she purports to reach "statistical" conclusions about issues such as the "average" Dean Omar verdict by simple arithmetic and without accounting for issues such pre-trial dismissals, post-trial setoffs, remittiturs and subsequent appellate history, and the impact of outlier verdicts. Indeed, Ms. Potter's so-called "average" Dean Omar verdict is almost entirely based on a single $80 million outlier verdict that has been set aside on appeal.

Finally, the underlying data upon which Ms. Potter relies derives from jury verdicts from various mesothelioma cases in jurisdictions across the country, all of which are inadmissible under Fed. R. Evid. 402 and 403. Evidence of verdicts in unrelated cases is

prejudicial to USF&G and has no relevance to its potential liability here. Such evidence should not be admitted at trial under the guise of expert testimony.

### A. Ms. Potter's Conclusions Concerning USF&G's Purported Failure to Settle *Finch* Are Inadmissible

Ms. Potter makes sweeping statements in her report that USF&G acted improperly in purportedly failing to settle the *Finch* case, opining that "USF&G failed timely to settle the Finch case when presented with the opportunity to do so," that "USF&G should, and could have, quickly ascertained the seriousness of the case," and that "[t]hese two points alone would normally require an immediate and aggressive settlement strategy." Potter Rpt. ¶¶ 4–6.

Ms. Potter is unqualified to offer opinions on these topics. Ms. Potter is not an expert in insurance claims handling, asbestos litigation defense, or any other relevant field of expertise, and is unqualified to offer such opinions based on her education and experience. *See* Ex. 8, Potter Tr. at 174:19–175:9; Potter Rpt. Ex. 1 (M. Potter CV).

In any event, Ms. Potter did not analyze the record here, and thus has no basis to opine whether USF&G made efforts to "timely" settle *Finch*, and nor does she have any basis to opine that USF&G had "the opportunity to do so." Nor did Ms. Potter sufficiently review the record to determine whether USF&G did, in fact, take *Finch* seriously or make reasonable attempts to settle the case, instead reviewing only the depositions and related exhibits of two of the Finch plaintiff's lawyers. Potter Tr. at 36:4–13. Indeed, Ms. Potter admitted at her deposition that she has no basis to opine on whether USF&G had the ability

to settle *Finch* or acted unreasonably in attempting to reach a settlement. *See id.* at 159:18–160:9:

> Q. [A]re you offering as an expert an opinion in this case that the insurers involved in this case actually had the ability to settle the case?
>
> A: I mean, I'm stating here that throughout the time of the case, there would have been an opportunity to settle, as there are in all cases.
>
> Q: Okay. And is there any support for that found in your report or the exhibits?
>
> A: I mean, besides stating it, I don't think so. It's just the normal life cycle of a claim, I would guess, is what I'm referring to there.

Opinions supported solely by an expert's own say-so are precluded by *Daubert* principles. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (opinions "connected to existing data only by the *ipse dixit* of the expert" are not admissible).

Thus, as Ms. Potter's opinions bearing on USF&G's purported failure to settle *Finch* are not the product of any reliable methodology or analysis, they must be excluded under Rule 702 and *Daubert*. *In re Lipitor*, 892 F.3d at 631.

### B. **Ms. Potter's Opinions Are Inadmissible Because They Fail To Satisfy *Daubert*'s "Fit" Requirement**

Ms. Potter's opinions are completely divorced from the governing legal standards the jury will be asked to make findings on in determining whether USF&G engaged in a bad-faith refusal to settle. Like Ms. Frost and the attorney expert on workers compensation litigation, claim valuation, and settlement strategy precluded in *Modern Automotive Network*, Ms. Potter has no background, experience, or expertise in insurance claim

handling. Indeed, she is not even an attorney, but a purported data analyst who studies asbestos litigation. Her proposed analysis of "national averages" of claim filings, number of defendants, mesothelioma claims, and verdicts in asbestos cases nationwide, and her opinions as to the Dean Omar firm's "propensity to try cases to verdict," do not take account of USF&G's applicable policy limits despite the central importance of that issue in determining whether USF&G engaged in a bad faith failure to settle consistent with the governing legal standards. Moreover, Ms. Potter has conducted no analysis supported by reliable methodology that she is qualified to perform as to whether the *Finch* action could have been settled within policy limits. In short, Ms. Potter's opinions fail to fit the standards governing Covil's claims against USF&G for many of the same reasons noted above with respect to Ms. Frost, and should therefore be excluded in their entirety.

### C. <u>Ms. Potter's Opinions Concerning Her "Data Analysis" Of Asbestos Jury Verdicts Are Inadmissible</u>

Ms. Potter offers the opinion that *Finch* was especially "risky" when compared to other mesothelioma cases because (1) it was filed in North Carolina, which is purportedly more "risky" than other jurisdictions, and (2) there were fewer defendants named in the original *Finch* complaint than in the average mesothelioma case. These opinions are based on a purported "data analysis" of mesothelioma filings and verdicts from January 1, 2014 through September 30, 2018. Neither of these opinions is based upon a reliable methodology, and they are not admissible under the *Daubert* framework.

First, Ms. Potter opines that there is a heightened level of risk when a mesothelioma case is filed in North Carolina compared to the average mesothelioma case nationally.

Potter Rpt. ¶¶ 20–26, 50. According to Ms. Potter, this risk arises not from a track record of high verdicts in North Carolina prior to *Finch*, but because relatively few mesothelioma cases are filed in North Carolina. According to Ms. Potter's report, between 0.18% and 0.48% of mesothelioma filings nationwide were filed in North Carolina in each year from 2014 to 2018. *Id.* ¶ 23. Based on these figures, she claims that "the few number of asbestos lawsuits filed annually in North Carolina make the state a very risky jurisdiction as outcomes are harder to predict than in higher volume jurisdictions." *Id.* ¶ 6. This opinion is not supported by any quantification, analysis, peer-reviewed work, or anything else besides her own say-so. As Ms. Potter acknowledged, there is no established methodology that is used in her field to determine the risk of a particular jurisdiction based on the volume of cases filed in the jurisdiction. *See* Potter Tr. at 120:1-6.

Further, Ms. Potter looked only at the relative sparsity of data in North Carolina in her own data set in concluding that North Carolina was a "risky" jurisdiction in which to try a case. She did not, for example, compare verdicts in asbestos cases generally (not limited to those alleging mesothelioma) in North Carolina versus other jurisdictions, consider what the highest dollar verdict had been in an asbestos case in North Carolina prior to the *Finch* trial, or conduct analysis of other factors that may make North Carolina a more or less difficult jurisdiction in which a defendant may try a mesothelioma case. *See* Potter Tr. at 123:4-124:2; 133:8-15. Nor was she able to articulate any established standard or methodology for determining how few mesothelioma cases in a jurisdiction is "too few" so as to give a jurisdiction a high-risk character. *See* Potter Tr. at 121:17-122:15:

> Q. I think a few minutes ago you said that North Carolina -- you described it as being risky. And I think you indicated that's because there aren't many filings in North Carolina compared to other jurisdictions. So, I'm asking you, if another expert came along and said there are enough filings in North Carolina, that it shouldn't be placed in that category, is there any threshold or any objective criteria you would point to to establish that you're right and the other person is wrong?
>
> A. I mean, at that point, if needed, we can do some statistical analysis from an objective standpoint. But one thing too that perhaps, you know, could refute that is my experience in the asbestos litigation with defendants, that they just know that North Carolina is not a hotbed of asbestos litigation. So, it is, in my experience, a place where defendants really have to take one case at a time and understand why they're getting sued in this place at this time, because it's different than what they typically see.

Ms. Potter's contention that "North Carolina is not a hotbed of asbestos litigation," which she says makes it ***more*** dangerous to try a case there, is not a proper expert opinion. It plainly and obviously fails each of the four factors that courts use to determine whether a data-driven methodology satisfies the *Daubert* standard:

> (1) "Whether a theory or technique can be (and has been) tested,"
>
> (2) "Whether it has been subjected to peer review and publication,"
>
> (3) "Whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation," and
>
> (4) "Whether the theory or technique enjoys general acceptance within a relevant scientific community."

*McDaniel*, 2021 WL 1111154, at *4 (quoting *Daubert*, 509 U.S. at 592-94).

Next, Ms. Potter opines that *Finch* was "difficult" and "high risk" because only sixteen defendants were named in the original complaint, versus a "national average" of more than sixty defendants. Potter Rpt. ¶¶ 31–34, 51. But the Potter Report does not articulate, and Ms. Potter was unable to articulate at her deposition, any methodology for quantifying the additional risk associated with fewer defendants being named in an asbestos case, and acknowledged that there is no established or peer-reviewed methodology for doing so. *See* Potter Tr. at 136:19-137:7, 138:20-139:3:

> Q. Is there any methodology you used to quantify the increased risk based on a lower number of defendants?
>
> A: No. I mean, besides the example I put in the report. That's an extremely easy, high level example. That's obvious to see, if you have a million -- if you, as a defendant, have to pay a million dollars, your share is going to be a lot different if there's 16 defendants versus 60.
>
> Q. But you can't quantify how much more risky a case with 16 defendants is than a case with 60 or 100?
>
> A: I mean, besides the simple division, that's not what I was trying to do in this report.

Nor was Ms. Potter able to articulate why, when a case goes to trial, there is additional "risk" or "seriousness" based on the *original* number of defendants, the sole data point considered in her analysis, versus the number of defendants actually going to trial—an issue she did not consider. Potter Tr. at 147:3-11. Ms. Potter's "methodology" is limited to what she herself admitted was "obvious to see": sixteen defendants is fewer than sixty defendants. Experts are not appropriate mouthpieces of "obvious" facts. *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986).

Like her opinions concerning the relative risk of litigating in North Carolina, Ms. Potter's opinions concerning the number of defendants in the original complaint does not satisfy the *Daubert* standard. *See McDaniel*, 2021 WL 1111154, at *4; *Wyeth-Ayerst*, 278 F. Supp. 2d at 690.

### D. Ms. Potter Should Be Precluded From Offering Opinions Concerning Dean Omar's Role as Trial Counsel

Ms. Potter further opines that the Dean Omar firm's role as counsel resulted in "additional risk added to [the *Finch*] case" (Potter Rpt. ¶ 7), and purports to analyze Dean Omar's mesothelioma trial verdict record and compare it to verdicts obtained by other asbestos plaintiff law firms. As Covil indicates in its trial witness list, it intends to present Ms. Potter's testimony to demonstrate that the Dean Omar law firm is "statistically superior" to other national plaintiff firms in terms of success before juries.

Specifically, Ms. Potter's opinions about this purported statistical superiority are that "Dean Omar is almost 10 times more likely to take a case to verdict than the national average" and that the "average verdict amount" when it wins a judgment for the plaintiff at trial is "over $16.5 million – an average significantly greater than that of the national average." Potter Rpt. ¶ 44.[6] Her opinion concerning Dean Omar is based upon taking the mathematical average (mean) of six publicly available jury verdict amounts, and ignoring two verdicts where the jury found for the defendant. *See* Potter Tr. at 82:15–20. But Ms.

[6] USF&G has also moved *in limine* to exclude evidence regarding verdicts in unrelated cases tried by Dean Omar. Evidence of Dean Omar's trial history is irrelevant to whether USF&G engaged in bad faith conduct with respect to *Finch*. For the reasons discussed in USF&G's motion *in limine*, evidence concerning Dean Omar's verdicts in unrelated cases across the country should be excluded, whether introduced through Ms. Potter or any other witness.

Potter's analysis and conclusions are based on unreliable principles and methods, insufficient and incomplete facts and data, and lack any statistical rigor.

Ms. Potter is unqualified to offer any opinions in the field of statistics, and her opinions have none of the hallmarks of a reliable statistical methodology. Ms. Potter admittedly lacks any experience or training in the field of statistical analysis and failed to apply any statistical methods or standards to her work. *See* Potter Tr. at 100:17–18 ("as far as like statistical analysis or sample size, I'm not opining on that"). Ms. Potter also fails to apply reliable statistical principles and methods; her analysis at most is simple arithmetic applied to publicly reported information. Ms. Potter admits that she is not an expert in the field of statistics. Potter Tr. at 15:15–17 (Q: Do you consider yourself an expert in the field of statistics? A: No."); Potter Rpt. Ex. 1 (M. Potter CV). For example, Ms. Potter makes no attempt to determine whether her population size of six Dean Omar verdicts in the plaintiff's favor (and eight cases taken to trial) is a sufficiently large population from which to draw meaningful statistical conclusions. *See* Potter Tr. at 95:3–8 ("Q. Are you offering a view on whether a success rate of six times out of eight occurrences is a large enough sample size from which to draw any conclusions? A: No.").

Additionally, in calculating her average verdict amount, Ms. Potter ignores pre-trial dismissals, post-trial setoffs, remittiturs and subsequent appellate history in the Dean Omar cases on which she bases her opinions, and does not attempt to account for the impact of outlier verdicts in her analysis. *See id*. at 56:6-9 ("what I'm trying to show in this case is what a jury ends up awarding for particular cases, not really dependent on what the defendant actually ends up paying"); *id*. at 59:10–13 (data used by Ms. Potter does not

reflect subsequent appellate proceedings); *id.* at 102:15–18 ("Q. Did you look at all, in connection with the work you've done in your report, on whether any of the data points should be treated as outliers? A. As far as this report, no.").

Importantly, the "average" verdict of $16.5 million that Ms. Potter puts so much weight on is heavily skewed by a single verdict in a Washington state court of $81.5 million. *See* Potter Rpt. ¶ 45. If that one verdict were excluded from the analysis, the "average" Dean Omar verdict would be approximately $3.5 million, and $2.5 million if counting defense verdicts as $0. *See* Potter Tr. at 105:6–107:3. Furthermore, the $81.5 million verdict that skews Ms. Potter's analysis was vacated by an appeals court as "so excessive that it shocks the court's conscience," and no longer stands.[7] *Coogan v. Borg-Warner Morse TEC Inc.*, 12 Wash. App. 2d 1021, *review granted sub nom. Coogan v. Genuine Parts Co.*, 195 Wash. 2d 1024, 466 P.3d 776 (2020). Yet, Ms. Potter's analysis ignores this subsequent appellate history, instead treating the $81.5 million verdict as if it were still standing. *See* Potter Tr. at 80:11-12; 105:2-5.

To permit testimony about an "average" Dean Omar verdict when that "average" is skewed by a single case that was vacated on appeal would be unfairly prejudicial and would mislead the jury. USF&G would be prejudiced by the risk that the jury would believe that the conclusions offered by Ms. Potter are statistically rigorous and sound. *See In re Lipitor*, 892 F.3d at 631 (because "expert witnesses have the potential to be both powerful and quite misleading," "proffered evidence that has a greater potential to mislead than to enlighten

---

[7] The verdict was vacated by the Washington Court of Appeals, Division II, and an appeal to the Washington Supreme Court was argued on November 10, 2020 and is under submission.

should be excluded."); *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 6887043, at *6 (N.D. Cal. Nov. 14, 2017) (where "the jury can do the grade-school arithmetic and follow counsel's closing argument on an easel," expert's testimony would "muddy the uncomplicated facts with his facade of expertise" and is therefore subject to exclusion under both Fed. R. Evid. 403 and 702).

Ms. Potter's supposed "statistical" opinion about Dean Omar is also not based on any specialized know-how beyond the ken of the jury. She simply takes six verdict amounts, adds them up, and divides by six to reach $16.5 million. Any person with a calculator could do the same. *See Callas v. Callas*, No. CV 14-7486, 2020 WL 3468084, at *5 (D.N.J. June 25, 2020) (To the extent an expert's opinion "is premised upon such simple multiplication, such an opinion would neither implicate matters requiring scientific, technical or specialized knowledge nor would assist the trier of fact. … [T]he trier of fact is more than capable of performing such basic multiplication.") (internal citations omitted); *see also Athey v. Nat'l Survival Games, Inc.*, 955 F.2d 40 (4th Cir. 1992) ("The general rule is well established that expert testimony is only required when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman.") (internal citations omitted).

The trial court, as "gatekeeper" of expert testimony, "must . . . 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Smith v. Ford Motor Co.*, 215 F.3d 713, 717 (7th Cir. 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143

L.Ed.2d 238 (1999)). Ms. Potter's testimony concerning the purported "statistical superiority" of the Dean Omar firm does not satisfy this standard and must be excluded.

### E. **<u>The Data that Ms. Potter Relies Upon Is Inadmissible, Incomplete, and Unfairly Prejudicial</u>**

In addition to the flaws that pervade Ms. Potter's opinions and methodologies, the underlying data upon which she relies is also inadmissible under Rule 402 because evidence of verdicts in unrelated mesothelioma cases across the country is irrelevant to whether USF&G engaged in bad faith with respect to *Finch*. Moreover, the set of verdict data that Ms. Potter's opinions are based upon does not represent all mesothelioma cases during the time period at issue, but rather is limited to filings that Ms. Potter's employer receives in connection with work for its clients. *See* Potter Rpt. ¶ 16; Potter Tr. at 46:9-14. Such an incomplete dataset is inadmissible under Fed. R. Evid. 402 and 403 and further demonstrates that admission of Ms. Potter's testimony is likely to mislead the jury, who may reasonably believe that Ms. Potter's conclusions are based on all mesothelioma cases in the country or that the data she relies upon is otherwise sufficiently representative as to allow her to draw methodologically reliable conclusions.

To the extent evidence of unrelated asbestos cases, with different plaintiffs, different defendants, different counsel, and before different courts has any arguable relevance, its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and is needlessly cumulative. *See* Fed. R. Evid. 403; *Brennan v. Paul Revere Life Ins. Co.* No. 00 C 0725, 2002 WL 1284385, at *4 (N.D. Ill. June 10, 2002).

## CONCLUSION

For the foregoing reasons, USF&G requests that Ms. Frost's, Ms. Barber's and Ms. Potter's testimony on these topics, and all arguments predicated thereon, be excluded from the trial of this matter.

Dated: June 21, 2021

/s/ *Andrew T. Frankel*
Andrew T. Frankel *(specially appearing)*
Mary Beth Forshaw *(specially appearing)*
Alan C. Turner *(specially appearing)*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
afrankel@stblaw.com
mbforshaw@stblaw.com
aturner@stblaw.com

Reid C. Adams, Jr. (Bar No. 9669)
Jonathan R. Reich (Bar No. 41546)
WOMBLE BOND DICKINSON (US) LLP
One West 4th Street
Winston-Salem, NC 27101
(336) 721-3674
cal.adams@wbd-us.com
jonathan.reich@wbd-us.com

*Attorneys for Defendant United States Fidelity and Guaranty Company*

**Local Rule 7.3(d)(1) Certification**

This filing exceeds the word limit prescribed by LR 7.3(d). Pursuant to this Court's order of June 17, 2021, no motion to exceed this limit is required.


/s/ *Andrew T. Frankel*
Andrew T. Frankel *(specially appearing)*
Mary Beth Forshaw *(specially appearing)*
Alan C. Turner *(specially appearing)*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
afrankel@stblaw.com
mbforshaw@stblaw.com
aturner@stblaw.com

Reid C. Adams, Jr. (Bar No. 9669)
Jonathan R. Reich (Bar No. 41546)
WOMBLE BOND DICKINSON (US) LLP
One West 4th Street
Winston-Salem, NC 27101
(336) 721-3674
cal.adams@wbd-us.com
jonathan.reich@wbd-us.com

*Attorneys for Defendant United States Fidelity and Guaranty Company*