# EXHIBIT 4

# EXPERT REPORT

**OF**

# LINDA MARTIN BARBER

**JULY 10, 2020**

Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 3 |
| II. | Asbestos Claim Handling | 3 |
| III. | Handling of the Finch Claim | 4 |
| IV. | Conclusion | 8 |

| | |
|---|---|
| Exhibit A | Expert Report of January 20, 2020 |
| Exhibit B | List of Prior Expert Testimony |
| Exhibit C | List of Materials Reviewed |

## I. INTRODUCTION

I have been requested by the law firm of Morgan, Lewis & Bockius LLP, counsel for the Receiver for Covil Corporation ("Covil"), to provide an expert report regarding the custom and practice within the insurance industry as to how liability insurers provide a defense to asbestos claims and how asbestos claims are resolved. In particular, I have been asked to opine whether the handling of the Finch claim comported with industry practice. I previously provided an expert report in this matter, which is attached as exhibit A and incorporated herein, that provides my qualifications and a description of the development of asbestos litigation.

I base my opinions on my training and experience with asbestos claims, asbestos litigation, insurance coverage and the reporting and collection of asbestos claim data. For this report I reviewed the materials listed in Exhibit B.

## II. ASBESTOS CLAIM HANDLING

1. Defendants in asbestos bodily injury litigation, and their insurers, recognized by the early 1980's, that most asbestos claims could be resolved for relatively small payments and that it was not cost effective to litigate a full defense in each lawsuit. A number of defendants had viable defenses that they could document, such as their lack of presence at the site where plaintiff was allegedly exposed. Plaintiffs would regularly agree to dismissals without extensive litigation. For those defendants left in cases with plaintiffs who could prove exposure, painful diseases, economic losses, and potentially punitive

damages for knowing use or distribution of inherently dangerous products, substantial settlements were necessary to avoid multi-million-dollar verdicts. This was particularly true in those jurisdictions considered friendly to plaintiffs.

2. Insurers developed specialized claim departments for the handling of asbestos claims and would assign all the cases related to a policyholder to an individual claim handler. That claim handler would be responsible for (a) determining the policyholder's history with asbestos products, available defenses, and coverage, (b) communicating with the policyholder, and other insurers, (c) retaining and managing outside defense counsel, (d) establishing case reserves, making payments, and maintaining records, and (e) resolving claims. Each claim handler would be supervised and subject to procedures designed to ensure each claim received appropriate handling. For instance, there would be regular reviews of claims, determination of their value, reporting to management, and supervision of outside counsel. Standard procedures included requiring counsel to report on pending cases, assess the value of each case, provide a litigation defense and budget, and obtain a written demand from counsel for plaintiff.

3. When dealing with potentially catastrophic claims, claim handlers are responsible for protecting the policyholder from verdicts in excess of applicable policy limits.

**III. HANDLING OF THE FINCH CLAIM**

4. Travelers and Zurich were involved in providing a defense to Covil in the asbestos litigation for many years.[1] The insurers split the Covil defense costs equally and any indemnity payments were allocated based on a claimant's months or years of exposure to Covil's products. Travelers had the largest share of the coverage and as a result, appears to have led the defense efforts and instructions to counsel.[2] The insurers had retained Daniel White of Gallivan, White & Boyd to defend the claims which for the most part, were filed in North and South Carolina. Mr. White and his firm are well respected and had substantial experience with defending asbestos bodily injury litigation.[3] They had defended Covil since the beginning of the asbestos litigation and knew the company and its defenses well. They had successfully resolved most of Covil's claims by voluntary dismissal or minimal payments of $1,000 or less.

---

[1] Sentry also insured Covil and is copied on many of the emails among the insurers and counsel. Sentry, however, successfully took the position that its coverage predated the Finch exposure and therefore, did not apply.

[2] Insurers were not in agreement as to how liability for defense expenses and indemnity payments should be allocated. See, inter alia, September 13, 2018 email of Zurich's counsel William Bulfer to Travelers and Sentry and response of September 17 from Irene Muse of Travelers. (Travelers 0054994-5).

[3] Mr. White was named Lawyer of the Year in 2019 for Mass Tort Litigation by Best Lawyers, recognized in Best Lawyers in America for product liability defense, and served as President of the South Carolina Bar Association in 2005 – 2006.

5. In a May 24, 2016 letter to Covil's insurers, Mr. White described the pending cases against Covil and warned of developments that "will significantly increase the potential exposure in those cases." In particular, Mr. White advised that (a) Motley Rice firm with which he had been able to resolve Covil's claims "has become less and less aggressive in handling and pushing its asbestos related cases" in North and South Carolina, (b) Jessica Dean, a Texas lawyer who had obtained a $38 million jury verdict in a 2013 Richland County, South Carolina mesothelioma case was now trial counsel in the North and South Carolina cases against Covil, and (c) unlike other remaining defendants, most of Covil's products contained amphibole asbestos, considered more likely to cause mesothelioma than other types of asbestos, a fact used by codefendants in the litigation. Mr. White recommended "developing lay and expert testimony in the event we go to trial." He had tried cases with Ms. Dean and warned that her association in the cases was a negative development for Covil's position in the litigation.

6. In 2017 Jessica Dean filed suit against 16 defendants, including Covil, in federal district court in North Carolina on behalf of Franklin Finch, who suffered from mesothelioma. Prior to trial, Mr. Finch died from his asbestos-related disease, and the case proceeded with his widow as the plaintiff.

7. On March 27, Mr. White reiterated his need for trial readiness to the insurers when advising that Covil's 30(b)(6) deposition was proceeding in the North Carolina Finch case after successfully limiting it to only one of 22 originally noticed topics. Despite Mr.

White's years of successfully defending Covil, his experience, and reputation, Travelers abruptly dismissed Covil's long-time counsel in April 2018 after Covil was ordered to produce its insurance policies in three Covil South Carolina cases. In an email dated March 7, 2018, related to the retention of new counsel, Travelers took the position that "The current demands are not reasonable and engaging with plaintiff counsel at this time under the circumstances we presently find ourselves is something that we do not feel is in Covil's or the carriers best interest." In addition, Travelers stated "we cannot enter into settlement discussions absent agreement on what each carriers share will be for a particular matter." Travelers also believed that they needed to "level the playing field and demonstrate we are prepared to litigate this tooth and nail. We have to push back."

8. The insurers moved Covil's defense and appellate work to the Wall Templeton law firm, with the Finch case primarily handled by William Silverman. Unlike Mr. White, Mr. Silverman had only tried two non-asbestos cases to verdict and was new to asbestos litigation. He had never tried an asbestos case. He had never tried a case in federal court. His partner, Mark Wall, was an experienced litigator in the asbestos litigation, but his role in the Finch case was minor.

9. In the months leading up to the October 2018 Finch trial, plaintiff's counsel Ms. Dean sought information from Covil's insurers and counsel about Covil's insurance policies and the limits available for the claims. She repeatedly demanded policy limits to settle

the Finch claim. The insurers delayed supplying coverage information until ordered to do so by the court, and then produced only partial policies and a written description of the coverage. Travelers and Zurich[4] repeatedly refused to meet with plaintiff's counsel to answer her questions about the coverage or to describe the remaining limits.

10. Prior to the Finch trial, insurers were advised that the Finch case against Covil presented a significant threat:

    a. "The addition of Jessica Dean …on the plaintiff's side will significantly increase the potential exposure [to Covil] in these cases." (Daniel White, May 24, 2016)

    b. "It is imperative that Covil develop its own defense because not only the plaintiff's counsel will be pointing the finger at Covil but so will co-defendants." (Daniel White, May 24, 2016)

    c. "This is a serious case." (Daniel White, October 13, 2017)

    d. "They want policy limits… But there is no question Covil supplied product to site. Bad case." (Mark Wall, July 13, 2018)

    e. Counsel estimated Finch verdict at $1 million to $3 million, with Covil being assessed a 15 to 35 percent share, and Covil only having a 10 to 20 percent chance of obtaining a defense verdict. (Silverman Trial Report of August 10, 2018)

---

[4] Although Zurich's coverage counsel did belatedly communicate with plaintiff's counsel, it was immediately prior to trial.

f. "Because this is a joint and several liability jurisdiction and we have a very sympathetic widow (right out of central casting), this could be a dangerous case. Both William [Silverman] and I recommend settling at $500,000." (Carol Weill, September 18, 2018).[5]

g. Before the jury announced its verdict, Irene Muse wrote to defense counsel of the verdict, "Well, you called the 9 ½ million. I'm thinking 3MM or less." (Irene Muse, October 5, 2018)

11. The insurers only offered $100,000 to settle the Finch case. Travelers believed it had $380,684 in remaining limits, while Zurich authorized Travelers to offer its $250,000 per person limit under its 1975 policy. If Travelers and Zurich had at least $630,000 in remaining limits, this is well above the only offer to the plaintiffs, and well above the $500,000 that Carol Weill of Zurich and William Silverman recommended offering to plaintiffs after the September 18, 2018 mediation. This position of a $100,000 offer persisted despite all other co-defendants settling prior to trial. The jury returned a verdict against Covil for $32.9 million in actual damages.

12. When an insurer defends a claim with a strong potential to exceed its policy limits, it has an obligation to protect its policyholder. Standard procedure is to make a good faith

---

[5] Weill's September 18, 2018 correspondence related to a court-ordered mediation, which Travelers elected not to attend.

effort to resolve the claim and advise other insurers on the risk (such as excess insurers) that their coverage could be impacted.

13. There is no evidence that either Travelers or Zurich made a reasonable effort to settle this claim. Zurich attempted to use its coverage counsel to assert to the Finch plaintiff that $100,000 was the best available offer, even though it later proferred $250,000 to Travelers to resolve the claim on its behalf. When proffered Zurich's $250,000, it was the responsibility of Travelers and Ranger[6] to attempt to resolve the case using the proffered funds. There is no indication that Travelers ever offered the plaintiff more than $100,000 to resolve the case. There is no indication that either Travelers or Zurich advised the excess insurers of the potential for the Finch litigation to end in a verdict impacting their excess coverage. Zurich and Travelers' failure to negotiate persisted despite the clear certainty that Finch would result in a substantial verdict.

## IV. CONCLUSION

14. The insurers in this case failed to develop a timely or adequate resolution for the Finch claim. They were advised that it was a bad case, and that their policyholder was going to be the only defendant at trial, it was one of the only amphibole defendants, had no causation defense, had no expert witness to testify at trial, and was very likely to lose. Insurers had selected a novice attorney to defend their policyholder while plaintiff's counsel had won multi-million dollar verdicts in asbestos cases. Although plaintiff's demand was $1.6 million or policy limits, there is no evidence that insurers made a good

[6] Ranger was notified of the Finch case prior to trial, and monitored on the basis that without exhaustion of the underlying coverage, they had no duty to participate.

faith effort to respond. Instead, as plaintiff counsel contended, the insurers stonewalled. The insurers argued among themselves as to their coverage and failed to protect their policyholder. The insurers' handling of the Finch claim is contrary to the standard practice of asbestos claim handling by insurers.

Respectfully submitted,

*Linda M. Barber*

*July 10, 2020*

# Exhibit A

## EXPERT REPORT

OF

## LINDA MARTIN BARBER

JANUARY 12, 2020

Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Qualifications | 1 |
| III. | Asbestos Litigation Background | 4 |
| IV. | Handling of Asbestos Claims | 6 |
| V. | Conclusion | 9 |

Exhibit A CV

Exhibit B List of Materials Reviewed

## I. INTRODUCTION

I have been requested by the law firm of Morgan, Lewis & Bockius LLP, counsel for Covil Corporation ("Covil"), to provide an expert report regarding the custom and practice within the insurance industry as to how liability insurers handle asbestos claims and the extent to which in particular, asbestos claims are classified as product claims or operations claims.

## II. QUALIFICATIONS

1. I have been involved with asbestos claims for more than forty years as an executive, counsel and consultant for insurers, reinsurers, and policyholders. In 2008 I established Arbitrations & Business Consulting to provide services as an arbitrator and consultant. During the years 1998 – 2008 I was a member of Peterson Consulting (subsequently Navigant Consulting) where I served as Managing Director and a senior member of the firm's insurance practice. At International Insurance Company from 1994-1998 I was a member of the Board of Directors and Senior Vice President for Claims. I was at Insurance Company of North America (subsequently CIGNA Property & Casualty Companies) during the years 1981-1994 where I served as Vice President, first as Assistant General Counsel to the insurance operations and then as head of Major Claims with responsibility for asbestos, hazardous waste, and toxic tort claims. After I was admitted to the Pennsylvania bar in 1976, I joined the law firm of Ballard, Spahr, Andrews & Ingersoll, where I was a member of the litigation department. My clients included Raybestos-Manhattan, one of the original defendants in the asbestos bodily-injury

litigation. In addition to my work defending Raybestos-Manhattan in asbestos bodily injury cases, I was coverage counsel for Travelers Insurance Company in one of the early asbestos coverage cases, AC&S v. Aetna, et al[7]. At the firm, I was counsel to insurance companies and did insurance defense and coverage work.

2. I have provided expert reports in approximately 35 proceedings in state and federal courts and arbitration panels and testified on 16 occasions. I have never been rejected as an expert. I have been accepted as an expert on asbestos matters in the Federal Court of Claims,[8] in claim handling by federal district courts,[9] and in asbestos claim handling by state trial courts in California, New Jersey, and New York.[10] I also have been accepted as an expert by numerous arbitration panels composed of insurance company executives. I have been retained as an expert or consultant by practically every major U.S. insurer and reinsurer. A copy of my

[7] The litigation involved a dispute between Armstrong World Industries and its former subsidiary Armstrong Contracting & Services as to how its insurance coverage would be allocated between the companies. Armstrong produced and sold asbestos products while AC&S installed them.

[8] Coltec Industries, Inc. v. The United States of America, 62 Fed Cl 716 (2004).

[9] Munich Reinsurance v. ANICO, 999 F. Sup 2d 690, 707 (D.NJ. 2014); Travelers Casualty and Surety Company v. ACE American Reinsurance Company, Civil Action 01-CV-98, E.D. PA. 2005; Arrowood Indemnity Company v. The Lubrizol Corporation, CA No. 1:10 CV 2871, (USDC ND OH 2016).

[10] Fuller Austin v. Stonewall, Superior Court, CA Case No. BC 116835, 2011; Credit Suisse v. Lehman et al, Civil Action No. (Morris Cnty, NJ), 2008; Continental Casualty Company, et al., v. Nationwide Indemnity Company, et al. NY Supreme Court, NY County No. 601037/03.

curriculum vitae is attached hereto as Exhibit A. I am being compensated at the hourly rate of $600 for my work on this matter.

3. I was certified as a reinsurance arbitrator by ARIAS-US and have arbitrated 30 insurance and reinsurance disputes and was appointed umpire in two others.

4. I have extensive experience handling, defending, analyzing, valuing, reviewing and reporting asbestos claims for hundreds of asbestos defendants, as well as dozens of insurers and reinsurers. I defended asbestos claims as policyholder's counsel and was counsel for an insurer in insurance coverage litigation involving asbestos claims. As an officer of an insurance company I was responsible for asbestos claim handling and related coverage litigation. I personally negotiated agreements as to how asbestos claims would be handled and paid, established reserves for asbestos liabilities, projected cash flow and coverage impairment, and prepared asbestos-related disclosures for filing with the Securities and Exchange Commission. I have provided advice to banks and investors about the value of a company's asbestos liabilities and the extent to which such liabilities were covered by insurance.

5. I have negotiated settlements of asbestos coverage disputes involving policy "buyouts" and coverage in place agreements.

6. I base my opinions on my training and experience with asbestos claims, asbestos litigation, insurance coverage and the reporting and collection of asbestos claim data. For this report I reviewed the materials listed in Exhibit B.

## III. ASBESTOS LITIGATION BACKGROUND

7. Asbestos litigation began in the early 1970's when Fred Baron succeeded in convincing a Texas court that asbestos was an inherently dangerous product for which manufacturers and distributors could be held strictly, and jointly and severally, liable.[11] That ruling prompted more filings against an initial group of about 30 defendants who in turn had disputes with their insurers over how insurance coverage should be applied to asbestos claims. The *Borel* litigation provided a template to plaintiffs' lawyers that enabled the filing of thousands of asbestos bodily injury claims with relative ease, particularly when counsel had access to pools of potential plaintiffs from labor unions. After *Borel*, plaintiffs could establish a valid claim merely by alleging exposure to certain asbestos-containing products and symptoms of an asbestos-related disease. Plaintiffs' lawyers could file dozens, hundreds, and even thousands of claims using a common form of complaint. The use of a common complaint form was enhanced by the use of computers, the sharing of information and forms among plaintiff attorneys, and ultimately the trial courts that adopted form complaints to avoid the avalanche of paper that was burying courthouses. Uniformly, the complaints alleged exposure to asbestos, which was alleged to be an inherently dangerous product that the defendants sold, manufactured and/or distributed. There were few individualized or detailed factual allegations, other than the type of work, identity of products, and years of employment for each of the plaintiffs.

---

[11] Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973).

8. The defendants included manufacturers, distributors, and sellers of asbestos products, as well as companies that installed asbestos containing materials. Despite the differences among the defendants, plaintiffs uniformly pled product liability cases and those cases that did go to trial relied on strict liability in tort and claims that asbestos was an inherently dangerous product.

9. It soon became apparent that insurance policies issued long before the plaintiffs filed their asbestos suits would be called upon to respond to the litigation. In 1978, Judge Feikens in the United States District Court for the Eastern District of Michigan issued a published decision holding that any insurer providing coverage when an asbestos plaintiff was allegedly exposed to asbestos was obligated to defend and indemnify its insured, even though the plaintiff's disease did not manifest itself during the period of insurer's coverage. *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 451 F.Supp. 1230 (E.D. Mich. 1978). Among other things, Judge Feikens noted that "[u]nder *Borel* and similar cases Forty-Eight may be held liable for asbestos-caused injuries occurring during the period from 1923 until 1970 when it discontinued the sale of asbestos products. If the manifestation theory is adopted, Forty-Eight would be effectively deprived of coverage it paid for and might be unable to secure coverage for liability in future cases where manifestation occurs after coverage is not available." *Id*. at 1240. The decision was affirmed by the Sixth Circuit Court of Appeals in 1980.[12] A similar decision was

---

[12] *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (1980).

issued by the Fifth Circuit Court of Appeals in 1981.[13] An even broader decision, adopting a continuous trigger of coverage, was issued in 1981 by the D.C. Circuit Court of Appeals.[14]

## IV. ASBESTOS CLAIM ANDLING

10. Asbestos claims were submitted to insurers as "product liability" claims since that was the theory alleged in the complaints. Plaintiffs did not describe with particularity the liability inducing behavior of defendants. Instead, plaintiffs focused on the inherently dangerous nature of asbestos, often with reference to the product limits of the defendant's policies. As discussed below, it wasn't until the 1990s that some companies began to distinguish between asbestos claims from exposure to asbestos products and asbestos claims arising from operations involving the handling of asbestos. The difference is significant for purposes of insurance coverage.

11. Standard Comprehensive (subsequently Commercial) General Liability policies have separate types of coverage within the terms of each policy. Coverage for claims arising from injuries caused by a policyholder's product fall within the product limits of a policy, a type of coverage usually limited to a specific dollar amount. Claims arising from the operations of a company – such as its installation of asbestos products- fall within the operations portion of the

---

[13] *Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir. 1981).

[14] *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981) (adopting a continuous trigger of coverage).

policy, which does not usually have any aggregate limit. In the 1970s and 1980s neither insurers nor policyholders forecasted the exhaustion of aggregate limits by asbestos claims.

12. The difference in the coverages was acknowledged, as is apparent from the Wellington Agreement which was signed in 1985 by many major asbestos defendants and their insurers. The insurer signatories included Aetna Life & Casualty Company, American Universal Insurance Group, Bituminous Casualty Corp., CIGNA Property and Casualty Insurance Companies, Continental Corp., Crum & Forster, Employers Insurance of Wausau, Fireman's Fund Insurance Company, First State Insurance Company, Genstar Corp., Harbor Insurance Company, Hartford Insurance Group, Liberty Mutual Insurance Company, Lloyd's of London, Reliance Insurance Company, Royal Insurance Company, and Zurich-American Insurance Companies. The agreement resolved coverage litigation among the parties and, among other provisions, established a limit for operations claims, represented as a multiplier of the aggregate limit, that did not otherwise exist in the policies. Otherwise, most policyholders and insurers did not take the time to distinguish between product or operations claims or gather factual information to substantiate operations claims.

13. Thus, despite the difference in coverage, efforts to categorize asbestos claims within the operations portion of a CGL policy did not begin in earnest until later in the 1990s when policyholders began to foresee exhaustion of their product coverage and certain significant operations coverage rulings were publicized.

14. In 1993, Fibreboard's efforts to secure coverage for its asbestos building claims as operations claims was publicized in the reported decision, *Fibreboard Corporation v. Hartford*, (16 Cal App 497 1993). In 1994, Fibreboard succeeded in its claim for recategorizing some of its asbestos claims as operations claims in an arbitration proceeding under the terms of the Wellington Agreement. Although the proceeding and decision were confidential, Fibreboard was required to provide details of the ruling to the other signatories to the Wellington Agreement. In the process, the ruling became publicized, inter alia, in Mealey's Litigation Reporter. In 1996, Owens Corning Fiberglass began recategorizing some of its asbestos claims as operations claims[15]

15. In 1997, published decisions were issued by the New York Court of Appeals and by an intermediate appellate court in Maryland concerning the potential applicability of operations coverage to asbestos insulation claims. *Frontier Insulation Contractors Inc. v. Merchants Mutual Insurance* Co., 690 N.E.2d 866 (N.Y. 1997); *Commercial Union Insurance Co. v. Porter Hayden Co., 698 A.2d 1167 (Md. App. 1997)*. Although both of these decisions involved the duty to defend based on a potential for coverage, the July 1998 edition of *Defense Counsel Journal* predicted correctly the emergence of new disputes between insurers and insureds over the classification and reclassification of asbestos claims under products coverage subject to an aggregate limit, and operations coverage that was not subject to an aggregate limit in the policies:

[15] See history of OCF's recategorizing efforts at *Commissioner v. Owens Corning Fibreboard Asbestos Trust* NJ 2013.

> Future disputes involving the scope of the "products" hazard will likely arise in two areas. First, as with these most recent rulings, cases involving earlier policies may center on "products" exclusions in policies issued in the 1960s and 1970s. The second, and potentially more problematic cases, are likely to follow and feature disputes as to whether insurers have validly exhausted their future policy obligations, particularly as regards the duty to defend, by past payments in satisfaction of the "products" aggregate.
>
> In light of these two new cases, defendants in mass tort litigation may well contest the allocation of indemnity payments to the "products" limit. In extreme cases, policyholders whose limits were exhausted years ago may seek to revive their claims, asserting that the insurers acted unfairly or deceptively in allocating all indemnity payments to the "products" aggregate. Such arguments may also be raised by tort claimants in jurisdictions that permit direct action claims or in bankruptcy proceedings to which claimants, policyholders and insurers alike are a party. See In re Dow Corning Corp., 194 B.R. 121 (E.D. Mich. 1996) (sustaining settlement based on payment of primary insurer's aggregate limits despite tort claimants' argument that additional limits should be paid).

65 Def. Couns. J. 434 (July 1998)

## V. CONCLUSION

16. Asbestos insurers were aware by no later than the mid-1970s that asbestos liability involved activities dating potentially to the early decades of the twentieth century, that statutes of limitations for this continuing tort would not provide insureds viable defenses to liability, and that insurance policies issued many decades earlier would be called upon to respond to the litigation. Although insurers and many policyholders were aware by the mid-1980s that some asbestos claims could be categorized as operations claims, efforts to do so did not begin until the early 1990's. By no later than 1994, it was generally known in the insurance industry that

policyholders with asbestos claims could assert coverage under the operations provisions of their CGL policies.

Respectfully submitted,

*Linda Martin Barber*

*January 12, 2020*

LindaMBarber@twc.com
Arbitration & Business Consulting
4530 W Lake Road
Chautauqua Shores
Mayville, NY 14757
Phone: (716) 789 9292
Fax: (716) 789 9292
Mobile: (716) 581 1817

**Areas of Expertise**
Industry:
1. Insurance and Reinsurance
Functional:
- Claims
- Reinsurance
- Asbestos
- Regulatory Compliance

Technical:
- Certified Reinsurance Arbitrator
- Law Degree

**Education**
Chatham College
BA, Cum Laude
Phi Beta Kappa

Temple University
JD, Cum Laude
Law Review Editor

**Employment**
Navigant Consulting
1998 - 2008

International Insurance Company
1994 – 1997

CIGNA Companies 1981 – 1994

Ballard, Spahr, Andrews & Ingersoll 1976 - 1981

GENERAL EXPERIENCE

Linda Martin Barber has 40 years of experience as an executive, counsel, and consultant for insurers and reinsurers. Mrs. Barber provides expert testimony and serves as an arbitrator. During her career she has been accepted as an expert in 34 federal, state and arbitration proceedings, served as an arbitrator in 29 insurance or reinsurance disputes, and served as an umpire in two reinsurance disputes.

Mrs. Barber consults clients on the financial and information management aspects of claims, underwriting, reinsurance, complex business and litigation related matters, such as mass tort litigation, insurance coverage cases, regulatory issues, and asbestos valuation.

Throughout her career Mrs. Barber has been involved in the collection, reporting, analysis, valuation and review of asbestos claim data for hundreds of asbestos defendants, as well as dozens of insurers and reinsurers. In addition to her experience defending asbestos defendants, she has analyzed the defense strategies of hundreds of asbestos defendants and reviewed in detail asbestos claim data for hundreds of defendants. She has valued asbestos claims, established related reserves, and projected asbestos cash flow and coverage impairment. She is familiar with the legislation and case law related to the defense of asbestos claims, and how the claims apply to insurance coverage. Her experience covers all types of asbestos defendants, products, and activities.

Prior to forming her own company, Mrs. Barber was a Managing Director of Navigant Consulting and a senior member of the firm's Insurance and Reinsurance Consulting Practice. Prior to Navigant Consulting, Inc., she served as Senior Vice President, Claims and a member of the Board of Directors of International Insurance Company where she worked to position the company for disposition as part of Xerox's plan to disengage from the business of insurance. As head of Claims for International she was responsible for GL, aviation, professional liability, workers comp, auto, and assumed reinsurance claims.

Mrs. Barber was Vice President of the CIGNA Companies from 1981-1994, serving in a number of capacities. In the Legal Division she was responsible for counseling CIGNA's property & casualty companies, including claims, compliance and regulatory matters, bond issues, business litigation, and reinsurance disputes. Throughout her career at CIGNA she was involved in all aspects of underwriting, claims and coverage disputes. In 1990, Mrs.

Barber became Vice President, Major Claims with responsibility for asbestos, hazardous waste, and other long tail claims.

At the law firm of Ballard, Spahr, Andrews & Ingersoll during the years 1976-81, Mrs. Barber worked on a diverse array of lawsuits as a member of the firm's litigation department. She had responsibility for insurance defense matters, insurance coverage disputes, and premium disputes.

Mrs. Barber was certified as a reinsurance arbitrator by ARIAS-US. She has served as a Director of the Pollution Liability Insurance Association, Chair of the Chautauqua Lake and Watershed Management Alliance and a Director of the Chautauqua Watershed Conservancy.

Exhibit B

1. The Receiver's Brief In Further Support Of His Presentation Of November 12, 2019 In Support Of Order On Rule To Show Cause, filed in *Falls v. CBS, et al* , *Howe v. Air & Liquid Systems, et al* and other similar matters in Crt Comn Pleas, 6th Dist, York County, South Carolina

2. Coverage chart for Covil Corporation

3. Wellington Agreement

4. Expert Report of Jeffrey W. Stempel

5. Zurich American v. Covil, et al Complaint

6. Memorandum of Law on Court's Jurisdiction, filed by Receiver for Covil in *Falls v. CBS, et al*, *Howe v. Air & Liquid Systems, et al* and other similar matters in Crt Comn Pleas, 6th Dist, York County, South Carolina

7. Response of Receiver to Motion for Deposit filed in Zurich American v. Covil et al, 6-12-19

Exhibit B

Linda M. Barber

**Linda Martin Barber**

LindaSMBarber@comcast.net
Arbitrations & Business Consulting
6307 Stone River Road
Bradenton, FL 34203
Office: (941) 807 8687
Mobile: (716) 581 1817

**Areas of Expertise**

- Insurance and Reinsurance
- Claims
- Reinsurance
- Asbestos
- Regulatory Compliance

**Education**

Chatham College
BA, Cum Laude
Phi Beta Kappa

Temple University
JD, Cum Laude
Law Review Editor

**Employment**

Navigant Consulting
1999 - 2008

International Insurance Company
1994 – 1997

CIGNA Companies 1981 – 1994

Ballard, Spahr, Andrews & Ingersoll 1976 - 1981

GENERAL EXPERIENCE

Linda Martin Barber has more than 40 years of experience as an executive, counsel, and consultant for insurers and reinsurers. Mrs. Barber provides expert testimony and serves as an arbitrator. During her career, she has been accepted as an expert in 16 federal, state and arbitration proceedings, served as an arbitrator in 32 insurance or reinsurance disputes, and served as an umpire in two reinsurance disputes.

Prior to forming her own company, Mrs. Barber was a Managing Director of Navigant Consulting and a senior member of the firm's Insurance and Reinsurance Consulting Practice. Prior to Navigant Consulting, Inc., she served as Senior Vice President, Claims and a member of the Board of Directors of International Insurance Company.

Mrs. Barber was Vice President of the CIGNA Companies from 1981-1994. She was responsible for counseling CIGNA's property & casualty companies and, was involved in all aspects of underwriting, claims and coverage disputes. In 1990, Mrs. Barber became Vice President, Major Claims with responsibility for asbestos, hazardous waste, and other long tail claims.

At the law firm of Ballard, Spahr, Andrews & Ingersoll during the years 1976-81, Mrs. Barber worked on a diverse array of lawsuits as a member of the firm's litigation department. She had responsibility for insurance defense matters, insurance coverage disputes, and premium disputes.

Mrs. Barber was certified as a reinsurance arbitrator by ARIAS-US. She has served as a Director of the Pollution Liability Insurance Association, Chair of the Chautauqua Lake and Watershed Management Alliance and President of the Chautauqua Watershed Conservancy.

**Exhibit C**

Expert Testimony

1. Zurich American Insurance v. Covil Corporation, et al., USDC, MDNC, 1:18-CV-932
2. Snyder, et al. v. California Insurance Guarantee Association, Superior Court, Alameda County, CA; RG-13-666656
3. Granite State v. Clearwater Insurance Company, Superior Court, San Francisco, CA; CGC 16-553779 (late notice of reinsurance claim)
4. ITT Asbestos Coverage Litigation, Superior Court, Los Angeles, CA; BC 290354 2017 (asbestos claim handling)
5. Confidential reinsurance arbitration, 2017 (timeliness and adequacy of notice to reinsurer)
6. Santa FE Braun v. INA et al, Superior Court, San Francisco CA; CG-04-428686 (asbestos claim handling)
7. Mineweaser v. Seaton et al, US District Ct, W D NY 14-cv-585; custom and practice of asbestos coverage settlements32
8. Confidential reinsurance arbitration, 2015 (adequacy of ceding company's notice)
9. Hartford Accident & Indemnity Company v. North River Insurance Company, et al New York Supreme Court, New York County Case No. 651296/2011; 2015 [lost policy]
10. Granite State v. Clearwater Insurance Company, NY Supreme Court, NY Cnty Index No 653546/2011; 2015 [reinsurance custom and practice]
11. Arrowood Insurance Company v. Lubrizol, CA No. 1:10 CV 2871, USDC ND OH; 2015 [environmental claims handling]
12. Air & Liquid Systems Corp., et al. v. Allianz Underwriters Ins. Co., et al. US District Court, WD PA, 2014 [custom and practice of consent to defense costs]
13. In re Thorpe Asbestos Coverage Cases, LA County Superior Ct, 2012 [custom & practice of handling asbestos claims – products and premises/operations]
14. Confidential reinsurance arbitration, 2012 [aggregation of asbestos claims]
15. Howden North America, Inc. v. ACE Property & Casualty Insurance Co. et al, US District Court, WD PA, CA 09-1014, 2012 [sufficiency of asbestos claims data]
16. Munich Reinsurance America, Inc. v. American National Insurance Company, ED PA CA 3:09cv06435, 2012 [timeliness of notice].
17. Eric Perkins, as Chapter 7 Trustee of the Estate Bankruptcy of Jae Jung Park v American Transit, Norman Volk & Associates, PC, Baker McEvoy Morrissey & Moskovits, PC, and Russo Keane & Toner LLP, SDNY CA No. 10 CV 05655, 2011 [quality of claim handling].
18. Fuller Austin v. Stonewall, Superior Court, CA Case No. BC 116835, 2011 [Custom and practice of handling of asbestos claims.]
19. Confidential reinsurance arbitration, 2011 [aggregation of asbestos claims]
20. Confidential reinsurance arbitration, 2009 [aggregation of asbestos claims]
21. Credit Suisse v. Lehman et al, Civil Action No. (Morris Cnty, NJ), 2008 [additional insured endorsement; reasonableness of mold claim coverage settlement]
22. Coachman Industries, Inc. vs. Alternative Service Concepts, L.L.C., U.S. SDTX, CA 06-0892, 2008 [custom and practice of providing notice]
23. Confidential reinsurance arbitration 2007 [allocation; commutation custom and practice]
24. Confidential reinsurance arbitration 2007 [allocation; commutation custom and practice]

25. Confidential reinsurance arbitration 2006 [commutation custom and practice]
26. Confidential arbitration, 2006) [finite reinsurance contract issues].
27. Viacom International, Inc. v. Admiral Insurance Co., et al 2006 [EIL custom and practice]
28. In the Matter of The Rehabilitation of Centaur Insurance Company, Illinois Circuit Court, Cook County – Chancery No. 87 CH 8615 2006 [valuation and allocation of asbestos claims]
29. Tribune Company et al v. Marsh, USA, Inc. et al, No. BC294960, Superior Court, Los Angeles County, CA [valuation of workers compensation book of claims] (2005)
30. Travelers Casualty and Surety Company v. ACE American Reinsurance Company, Civil Action 01-CV-98, E.D. PA. 2005 [allocation, duty of good faith and fair dealing]
31. Continental Casualty Company, et al., v. Nationwide Indemnity Company, et al. NY Supreme Court, NY County No. 601037/03, subject to confidentiality order [custom and practice of handling asbestos claims] (2005).
32. Universal Underwriters Insurance Company, Inc. vs. Federal Insurance Company, et al (Westwood Lincoln Mercury, Inc.) (2004); Super Ct., NJ, Mercer Cnty [Definition of excess and umbrella coverage offered for Universal]
33. Coltec Industries, Inc. v. The United States of America, Fed Cl, 2004-2 USTC ¶50,402. sealed [asbestos valuation]; reversed on appeal (U.S. Court of Appeals, Federal Circuit; 05-5111, July 12, 2006).
34. Confidential arbitration, 2004 [quality of claim handling on NYC livery business]
35. Confidential reinsurance arbitration, 2004 [duty of good faith and fair dealing ceding company owes to reinsurer in handling business reinsured as represented in contract and during underwriting process; retained by reinsurer.]
36. Confidential reinsurance arbitration, 2003 [appropriateness of process used to determine IBNR for asbestos accounts]
37. Smithkline Beecham Corporation v. Aetna et al, Super. Ct., NJ Middlesex Cnty Docket MID-L-7799-94) (2003) [environmental impairment policies]
38. Confidential reinsurance arbitration, 2003 [aggregation of construction defect claims]
39. Confidential reinsurance arbitration, 1998 [Nature of business underwritten by facultative reinsurer alleged by retrocessionnaire to be contrary to representations made at time of reinsurance negotiations]

Exhibit D

1. Deposition of Jessica Dean with all exhibits
2. Deposition of Trey Branham with all exhibits
3. Deposition of William Silverman with all exhibits
4. Deposition of Daniel White with all exhibits
5. TRAV_ST_0052930
6. TRAV_ST_0052961
7. TRAV_ST_0052962
8. TRAV_ST_0052984
9. TRAV_ST_0052990
10. TRAV_ST_0054993
11. TRAV_ST_0055601
12. TRAV_ST_0055739
13. TRAV_ST_0055740
14. TRAV_ST_0057642
15. TRAV_ST_0058470
16. TRAV_ST_0059689
17. TRAV_ST_0059693
18. TRAV_ST_0060259
19. TRAV_ST_0060842
20. TRAV_ST_0060890
21. TRAV_ST_0063306
22. TRAV_ST_0065249
23. TRAV_ST_0065523

24. TRAV_ST_0065539
25. TRAV_ST_0068479
26. TRAV_ST_0068855
27. TRAV_ST_0070136
28. TRAV_ST_0070960
29. TRAV_ST_0074840
30. TRAV_ST_0075787
31. TRAV_ST_0075919
32. TRAV_ST_0096536
33. ZUR 102487
34. ZUR 148589
35. ZUR 148971
36. ZUR 150519
37. ZUR 159120
38. ZUR 159226
39. ZUR 182885
40. ZUR 182885
41. SENTRY 350942