# EXHIBIT 6

Deposition of:

# Linda Barber

*July 31, 2020*

In the Matter of:

# Zurich American Insurance v. Covil Corporation, Et Al.

Caseworks Court Reporting
800.955.0541 | calendar-caseworks@veritext.com |
www.veritext.com

Mr. Branham, Mr. Silverman, and Mr. White.

Are those depositions that you requested or that were provided to you at counsel's suggestion?

A. That's a good question. I can't -- I -- they were supplied to me. I don't recall if I asked for one or the other or not. I just don't have a recollection one way or the other.

Q. With respect to Items 5 through 41, these other documents that are listed here, how was it determined that you would look at these particular documents?

A. Well, counsel provided documents to me, but then based on what they supplied to me, I asked for more because I wanted to kind of fill in the blanks as much as possible with regard to all of the communications of the carriers.

Q. And when you asked counsel for additional documents, what kind of documents did you ask for?

A. Well, I -- I wanted to put together a timeline of the communications of the carriers and counsel with regard to the Finch case.

So I also wanted to understand more about the insurers' reasons for what they were doing in handling the defense of the Finch case, so I kept asking for more documents in that regard.

Q. And did you actually create the timeline that

you said that you were contemplating?
A. No. I just put the doc- -- the documents in chronological order.
Q. Okay. And did you prepare some kind of written timeline other than just assembling the documents in order?
A. No.
(At this time a non-related party entered and exited the room Mr. Turner was remotely attending from.)
MR. TURNER: I apologize for the distraction behind me.
BY MR. TURNER:
Q. Are there any documents that you requested that you were not provided with?
A. No.
Q. Did you ask to see deposition testimony of any other individuals whose names you saw in the documents?
A. No. I don't -- I don't recall any, no.
Q. Okay. And you understand that Ms. Dean and Mr. Branham were counsel for the Finch estate, correct?
A. Well, yes. To the --
Q. And you understood that --
A. -- Finch and then for his wife, yes.
Q. Right. And you understood that Mr. White and

Mr. Silverman at different times were counsel for Covil in the Finch case, correct?
A. Correct.
Q. Did you at any time request to see any deposition testimony of any of the representatives or employees of the insurance carriers who were involved in handling the Finch matter?
A. I recall asking at one point in time whether or not depositions such as those were taken, and I know -- I know that when I got the other expert report, I had a question about Mr. Begley's deposition, but other than that, no.
Q. Okay. And what did you understand as to whether there was deposition testimony of any of the employees of the insurance carriers involved in the Finch matter?
A. I -- I don't have a recollection one way or another other than Mr. Begley's deposition hadn't been taken.
Q. Okay. And -- and sitting here today, you don't recall one way or the other whether or not you asked to see any such deposition testimony of employees of the insurance carriers?
A. I can't recall. I looked at all the documents, and I asked for more documents to fill in some blanks.

So at the time I was writing my report, I don't -- I don't -- I don't recall any other discussion of employee depositions.
Q. Okay. Well, your expert report addresses the conduct of USF&G and Zurich with respect to the handling of the Finch claim, correct?
A. Yes.
Q. Did you not think that it would be relevant to your expert opinion to consider any testimony provided by any of the employees of those carriers?
A. Well, I did not need their testimony to reach my conclusion. I would be happy to look at whatever they had to say, but based on what I've seen, I'm very comfortable with -- with my opinion.
Q. Okay. So you formed your opinion --
A. I don't feel that I -- excuse me.
I don't feel that I -- I need to see anything else to reach my conclusion.
Q. Okay. So you were satisfied by looking at the testimony of other individuals and the documents to form your opinions with respect to the conduct of the carriers; is that right?
A. Yeah. In the world of insurance claims documentation is critical, and the documentation here is -- is lacking. The -- the failure to follow standard

procedures is -- is pretty evident, and you just can't explain that away.

Q. Okay. And to be clear --

A. Most of the documents weren't produced.

Q. Now, turning, please, to the first -- or I guess numbered Page 3 of your report, but it's the first substantive page, Exhibit Introduction. Let me know when you're with me, please.

A. Okay. What page? 3?

Q. It says Page 3 at the bottom, but it's --

A. Okay.

Q. -- actually the first substantive page.

A. Okay.

Q. And I'm looking in your introduction paragraph, and you say that you've been asked to provide an expert report regarding the custom and practice within the insurance industry as to how liability insurers provide a defense to asbestos claims and how asbestos claims are resolved, right?

A. Yes.

Q. Okay. And -- and so your opinion here is a custom and practice opinion; is that fair to say?

A. Yes. The practices of the insurance industry.

Q. Okay. And you say in the next sentence, "In particular, I have been asked to opine whether the

handling of the Finch claim comported with industry practice."

Is that right?

A. Yes.

Q. What -- what do you mean by "industry practice" in that sentence?

A. Specifically or generically?

Q. Let's start generally.

A. Well, insurance companies have particular procedures that are followed for a number of reasons. Some of them are regulatory. Others relate to the need for information about the insurance claims as well as underwriting.

So procedures have been developed so that that information can be supplied and con- -- and contractual obligations met.

Q. Okay. And different insurance companies have different policies, practices, and procedures, right?

A. They may, but there are some basics that are required and considered basic in claim handling.

Q. Okay. And you frame your opinion in terms of industry practice here.

Who determines what constitutes industry practice?

A. Who determines? Well, it's the -- the practice

is a culmination of what companies have done.
Q. So is that written down somewhere?
A. Well, companies will have procedures and procedural manuals. They will have practices that they abide by with regard to documentation and handling of claims, reporting of claims.
Q. And each company's written policies and procedures with respect to claims handling are different, correct?
A. Well, they may differ on some points, but they don't differ on the key ones and --
Q. And what's your basis for -- sorry. I didn't mean to interrupt.
A. Go ahead.
Q. What's your basis for believing that all insurance companies have similar policies and procedures with respect to claims handling?
A. My review, my work within the industry, working with other insurance companies, reviewing claim files, reviewing claim manuals, claim procedures, doing claim audits, claim reviews, being involved in production of claim files, development of claim systems, reviewing reports to reinsurers from insurance companies.
I mean, you name it; the whole gamut.
Q. And would it be fair to say that different

insurers may have different opinions about what constitutes standard industry practice with respect to claims handling?
A. I -- I don't know what opinions insurance companies have about it one way or the other. All I can tell you is based on my -- oh, my God -- 40 years in this business, there are certain basic procedures that claims are subject to in an insurance company and --
Q. Okay. And what I -- I'm sorry. I did -- I did it again.
Please finish.
A. I -- I finished.
Q. And I'm sorry. There's -- there's a little time lag, which is why sometimes I am stepping on the end of your answers, but I'll try to stop doing that.
You've testified that there are certain basic practices with respect to claims handling.
Are you able to identify those at a high level now?
A. Sure. We can go through it rather quickly.
Number one, you document the receipt of a claim. It is entered into a system, and that triggers a number of different things.
In the claim department the claim will then be assigned, and there will be an initial determination of

coverage, which in standard claims isn't difficult, but with long-tail claims it is.

And then there will be generically an investigation of the claim, a response and acknowledgment to the policyholder. Any issues of coverage are raised, and there are communications with the policyholder with regard to defending a claim and determining the validity of a claim and its resolution. That's pretty high level, generic.

Then claim departments have certain procedures within the department to ensure that claims are handled fairly and responsible.

Q. Would you agree with me that different insurance professionals can reasonably disagree concerning the optimal strategy to handle liability claims and insureds?

A. Well, you're pretty -- you're talking pretty generically now.

When you say the "optimum strategy," for what?

I mean, the -- the responsibility of the insurance company is to comply with its insurance policies by providing a defense and resolving valid claims against its policyholders.

Q. And would you agree with me that the decisions made by insurance professionals with respect to how to

resolve claims against policyholders involve a degree of professional judgment?

A. There is professional judgment, but all such judgment has to be based on reasonableness and documented.

Q. And would you also agree with me that there is a degree of professional judgment involved in deciding whether and how to negotiate the potential settle- -- settlement of a liability claim against an insured?

THE WITNESS: I'm sorry. Could -- could somebody read the question back?

THE COURT REPORTER: Would you like me to do so, Mr. Turner?

MR. TURNER: Yes.

THE WITNESS: Yes, please.

THE COURT REPORTER: One moment.

"Question: And would you also agree with me that there is a degree of professional judgment involved in deciding whether and how to negotiate the possible settle- -- settlement of a liability claim against an insured?"

THE WITNESS: I'm sorry. I thought I answered that.

There is professional judgment. That should be based upon a reasonable -- a reasonable basis and

documented.
BY MR. TURNER:
Q. Okay.
A. And there are procedures in insurance companies to ensure that that happens.
Q. Now, I'm -- I want to look at your conclusion before we go into the details that you address before reaching your conclusion.
If you'd go to Page 11 of your report, please.
A. (Witness complied.) Yes.
Q. Do you see that?
That's the end of Paragraph 14, which is the conclusion paragraph in your report, right?
A. Yes.
Q. And you say in the very last sentence of that paragraph, "The insurers' handling of the Finch claim is contrary to the standard practice of asbestos claim handling by insurers."
You see that?
A. I do. That is correct.
Q. And that's the opinion that you're offering in this case, correct?
A. Yes.
Q. Okay. And the reasons that you believe the insurers' handling of the Finch claim was contrary to

the standard practice I believe are summarized in Paragraph 12 of your report. I just want to be sure that I understand that correctly.

Can you turn to Paragraph 12 with me -- with me, please?

THE WITNESS: I -- I'm sorry. I need to take a break for a few minutes. Excuse me.

MR. TURNER: Okay. We can go off right now.

Do you want to take five or ten minutes?

THE WITNESS: Four minutes is probably enough. I apologize, but something's just come up.

MR. TURNER: That's fine.

Should we reconvene at 1:25?

THE WITNESS: Whatever works.

Can we just put this on mute or something and --

THE VIDEOGRAPHER: Yes.

THE WITNESS: -- I don't have to sign out.

MR. TURNER: We have to go off the record, yes.

THE VIDEOGRAPHER: Okay. Time now is 1:20 p.m. We're going off record. This ends Media Unit 1.

MR. TURNER: So let's convene at 1:25, please.

(Recess taken from 1:20 p.m. to 1:26 p.m.)

THE VIDEOGRAPHER: The time now is 1:26 p.m. We are back on record. This begins Media Unit 2.

BY MR. TURNER:
Q. Ms. Barber, we were looking at Paragraph 12 of your expert report.
Are you there with me?
A. I am.
Q. In the second sentence of Paragraph 12 you say, "Standard procedure is to make a good faith effort to resolve the claim and advise other insurers on the risk (such as excess insurers) that their coverage could be impacted."
You see that?
A. I'm sorry. I -- I --
Where are you on the report?
Q. Paragraph 12.
A. Oh, okay.
Q. Let me start again, then.
Do you see in Paragraph 12 that you say, "Standard procedure is to make a good faith effort to resolve the claim and advise other insurers on the risk (such as excess insurers) that their coverage could be impacted"?
Do you see that?
A. Yes. Yes.
Q. And that's your opinion that that --
A. Yes.

Q. Bear with me one minute, please.
(Pause in the proceedings.)
(Deposition Exhibit 18 was marked.)
BY MR. TURNER:
Q. Okay. I've marked Exhibit 18. Just let me know when that comes up on your screen, please.
A. (Witness perused document.)
I have it in front of me.
Q. Okay. And do you see this is another exchange of e-mails between Mr. Fries and Ms. Burdin, and it includes also the representatives of Zurich and other people from Travelers, right?
A. Yes.
Q. And it's about the Finch case?
A. It is.
Now, here it indicates they've offered 100,000. The last one said 300,000.
Q. Right. It certainly appeared from the record that there was some confusion as to whether it was 100,000 or 300,000, right?
A. Yes.
MR. RASKIN: Object to form.
BY MR. TURNER:
Q. And if you look at the e-mail from Mr. Fries, he's laying out the available -- available USF&G and

Zurich limits, being $381,000 and $250,000 respectively, right?
A. Well, it says what it says. I see it there.
Q. Right. And let's see here.
It says, "Travelers and Zurich agree that we should not bid against ourselves by increasing our settlement offer absent a good faith counter offer by plaintiffs' counsel."
You see that?
A. Yes.
Q. In the settlement context, in your experience, what does it mean to bid against yourself?
A. Well, generally you want a response to your offer before you make a counteroffer.
Q. And why is that?
A. You don't want to bid against yourself.
Q. Why would you not want to bid against yourself?
A. You want to know what the plaintiff's demand is. They're not coming off their demand of $1.6 million, so --
Q. Now, that was the state of affairs as of October 1st when the Finch trial started, right?
A. I don't know, because the one memo says 300. This one says 100. So I don't know what the extent -- I have not seen any formal letter between counsel for the

parties that lay out the numbers.
There is confusion in the testimony, and this is what happens when people do not put offers in writing in formal documents; not e-mails, but a letter.
Q. So your preference is for --
A. Here the --
Q. -- letters to be sent rather than e-mails when it comes to settlement discussions?
A. I'm just saying that there is confusion on the numbers, it appears, among all the parties in the testimony, in the documents, and that is an indication that nobody's minding the store.
Q. Well, I think the people were minding the store, were they not, because they knew that the plaintiff's only reference to a potential settlement figure in the week prior to trial was $1.6 million, right?
MR. RASKIN: Object to form.
BY MR. TURNER:
Q. That's referenced in several documents that we've seen today, correct?
MR. RASKIN: Object to form.
MR. BRANHAM: Object to the form. Misstates testimony.
THE WITNESS: There are documents that refer to

that. There is testimony that says that wasn't the demand. So there is confusion on the topic.

I mean, the -- the point is, is that the negotiations did not continue.

BY MR. TURNER:

Q. But certainly it's clear from the documents that we've looked at that Ranger was involved in direct communications with USF&G and Zurich with respect to the Finch matter prior to and during the trial, correct?

MR. RASKIN: Object to form.

THE WITNESS: Well, they -- they were advised on the eve of trial.

BY MR. TURNER:

Q. Well, you don't know that because you haven't looked at the record other than the two documents I've shown you, correct?

A. Well, I'm looking at this. It says October 1st is the date of this. And Steven's document is dated September 27th, so --

Q. Do you -- do you know when Ranger was first put on notice of the Finch claim?

A. Of the Finch claim? I don't know, sitting here right now.

Q. Okay. Are you aware whether claimant's counsel, the Dean Omar firm, was in communication with

Ranger, the excess carrier, with respect to the Finch claim?
A. No. I don't know that.
Q. That's not something you saw in the record?
A. I haven't seen any indication of that.
Q. Okay. Sorry. Bear with me one moment.
(Pause in the proceedings.)
MR. TURNER: Sorry. I'm waiting for it -- an exhibit to load up. It's taking a while.
(Deposition Exhibit 19 was marked.)
BY MR. TURNER:
Q. Okay. All right. So this is Exhibit 19. Now, please let me know when it appears on your screen.
A. (Witness perused document.)
I have it in front of me.
Q. Okay. Do you see that it is an October 3rd, 2018, letter from Mr. Branham to Pauline Burdin of Riverstone?
A. Yes.
Q. And it is with respect to the Finch claim, correct?
A. Yes. It's during trial, October 3rd.
Q. Right. And you see that the letter from Mr. Branham references September 27th, 2018, correspondence from Ms. Burdin and subpoenas that had

been served on Evanston Insurance Company and Fairmont Insurance Company, formerly Ranger Insurance Corp -- Company.

You see that?

A. Yes.

Q. And do you remember that Evanston Insurance Company was one of the companies that received one of the letters from Gallivan, White & Boyd in February of 2018 with respect to Covil?

A. Yes.

Q. And so this is a continuation of direct communications between Mr. Branham for Dean Omar and Ms. Burdin on behalf of Ranger with respect to the Finch claim, correct?

MR. RASKIN: Object to form.

THE WITNESS: Correct.

BY MR. TURNER:

Q. This is not the first time they were communicating, correct?

A. Who was communicating?

Q. It appears from the face of the letter that this is not the first time that Mr. Branham and Ms. Burdin were communicating regarding the Finch claim?

A. I don't know.

Q. Okay. Well, it says -- let's read it -- "As

you know, we are presently in trial in the above referenced case against your insured."
See that?
A. Yes.
Q. It says, "Plaintiffs sent the attached policy limits demand to your insured via its counsel on February 14, 2018."
You see that?
A. Yes.
Q. And it attaches the letter that we've seen previously, right?
A. I don't know. I don't know if I have an attachment here.
Q. If you scroll down with me, you'll see it there.
A. I see it, yep.
Q. Okay. Mr. Branham goes on to write, "Your carrier has chosen not to participate in any resolution discussions and should we prevail on this matter in an amount that implicates Ranger, we will seek to fully recover from Ranger even in amounts in excess of the policy limits."
Do you see that?
A. I do see that.
Q. So certainly at least by October 3rd, 2018,

Ranger was on notice directly from the claimant's counsel that they would seek to hold Ranger responsible for any amounts on its policy or in excess of its policy on the Finch matter, right?

A. That's what it says.

Q. So it's clear from the documents that I've shown you, is it not, that Ranger was aware of the Finch case and was in communication with other carriers and the claimant's counsel with respect to the Finch case, correct?

A. Well, I wouldn't say it that way, but there clearly were communications, and there -- Ranger was in the loop.

Q. Right. So when you say in your report that there's no indication in the record of that occurring, that's inconsistent with these documents, is it not?

MR. RASKIN: Object to form.

THE WITNESS: No. The way I stated it isn't.

(Pause in the proceedings.)

BY MR. TURNER:

Q. I'm sorry, ma'am.

Did you answer the question?

A. I -- I apologize. I --

Could the question be read back?

THE COURT REPORTER: Would you like me to read

it back, sir?
MR. TURNER: Sorry. Yes, please.
THE COURT REPORTER: Just one moment.
Excuse me.
"Question: So when you say in your report that there's no indication in the record of that occurring, that's inconsistent with these documents, is it not?"
THE WITNESS: And I did reply to your question, and I said that's not what I say in my report.
BY MR. TURNER:
Q. Well, Ms. Barber, you say in your report that there's no indication that either Travelers or Zurich advised the excess insurers of the potential for the Finch litigation to end in a verdict impacting their excess coverage.
Is it or is it not true that Ranger was, in fact, aware of that very information, was in communication with Travelers and Zurich, and was in communication with the plaintiff's counsel with respect to Finch?
MR. RASKIN: Object to form.
THE WITNESS: From the documents that we just looked at, it appears as if while the trial was going on and immediately prior to the trial there

were some communication.
BY MR. TURNER:
Q. And you weren't aware of those documents when you wrote your opinion, were you?
A. They don't change my opinion.
Q. What exactly is it that you say that USF&G and Zurich should have done that they didn't do with respect to communications with Ranger?
A. They should have had more timely communications.
They should have made an effort to involve Ranger in -- once there were demands for all available policy limits, which predates September by quite a bit. At that point in time the carriers should have been notified, and then defense counsel should have made an effort to include as many of the carriers as possible in the settlement negotiations.
Q. Do you think Mr. Branham was correct when he wrote in his letter to Ranger's representative that Ranger has chosen not to participate in any resolution discussions?
Was Mr. Branham right about that?
A. I -- I don't know.
Q. You just haven't looked at the record about that?

A. I'm sorry. I'm having trouble understanding what you're saying.

Q. You didn't -- you haven't looked at the record to see whether or not it reflects that Ranger chose not to participate in settlement discussions?

A. I -- I don't know whether they chose not to or not. I have seen a reference to that.

Q. Was Hartford one of the other carriers that you say should have been notified of this claim?

MR. RASKIN: Object to form.

THE WITNESS: I mean, I -- I told you that I didn't do an analysis of the coverage and who the carriers were or weren't.

BY MR. TURNER:

Q. So you're offering an opinion that the excess insurers were not informed of the Finch claim, but you don't know which carriers you're talking about?

MR. RASKIN: Object to form.

THE WITNESS: What -- what I'm saying is that when there were -- there was a demand for all policy limits, which, as I recall, is back in April, if not before April -- February -- back in February, efforts should have been made at that point in time to make sure all of the potential carriers for Covil were aware of the demand and the exposure in the

case.
BY MR. TURNER:
Q. Okay. Sorry. Bear with me one second.
Sorry. I'm trying to find a document. Hold on one second.
(Pause in the proceedings.)
(Deposition Exhibit 20 was marked.)
BY MR. TURNER:
Q. Okay. I've marked Exhibit 20. Just let me know when that shows up on your screen, please.
A. (Witness perused document.)
I have the document in front of me. I don't believe I've seen this before.
Q. Okay. This is a July 6, 2018, letter to Mr. James Ruggeri, who was counsel for Hartford, right?
A. I don't know. The document says what it says.
Q. Okay. You're not aware that Mr. Ruggeri and his firm were counsel for Hartford in this matter?
A. No.
Q. Okay. And do you see that the letter is urging Hartford to take a coverage position with respect to claims against Covil, including the Finch case?
A. Well, the letter says what it says. I haven't seen it before.
Q. And so you didn't see documents like this in

the record which show that Hartford was involved in communications with other carriers with respect to the Finch claim?

MR. RASKIN: Object to form.

THE WITNESS: I -- I don't recall this document, no.

BY MR. TURNER:

Q. Okay. So when you reached your opinion that excess carriers were not aware of the Finch claim, did you ask Mr. Raskin's firm to give you documents if they existed that showed that?

MR. RASKIN: Okay. I'm going to give you more than a form objection here. You have misstated or reported her testimony, and you're casting aspersions on us.

Rephrase that question. It's completely inappropriate.

MR. TURNER: Okay. My question stands.

MR. RASKIN: Well, your question is inappropriate.

Please read it back, Ms. Reporter.

THE COURT REPORTER: Just one moment.

"Question: Okay. So when you reached your opinion that excess carriers were not aware of the Finch claim, did you ask Mr. Raskin's firm to give

you documents that showed that?"

THE WITNESS: Well, first of all, you've mischaracterized what my report says.

BY MR. TURNER:

Q. I didn't mean to do that. However, if I've done that, I apologize.

MR. RASKIN: Isn't it obvious? Go look at the report.

BY MR. TURNER:

Q. I can be more specific if you would like.

When you say in your report, "There is no indication that either Travelers or Zurich advised the excess insurers of the potential for the Finch litigation to end in a verdict impacting their excess coverage," what documents did you base that opinion on?

A. Well, the documents I reviewed.

Q. Okay. My question simply is, did you ask whether additional documents existed that might show a different set of facts than you concluded?

MR. RASKIN: Object to form.

THE WITNESS: (Witness shook head from side to side.) I think I've answered the question.

BY MR. TURNER:

Q. Okay. It's really just a question of process, ma'am.

When you were preparing your opinions, did you ask for documents that might show the contrary of the conclusion that you reached with respect to whether excess carriers were on notice of the Finch claim?
A. I don't recall of such a --
MR. RASKIN: Object to form.
It was an objection to form.
THE WITNESS: I just don't recall a specific question.
BY MR. TURNER:
Q. Can I ask you to look at Paragraph 4 of your report, please?
A. (Witness complied.)
I have it in front of me.
Q. Great. On the fourth line there's a sentence that says, "Travelers had the largest share of the coverage and, as a result, appears to have led the defense effort" -- "efforts and instructions to counsel."
Did I read that correctly?
A. Yes.
Q. And when you say "largest share of the coverage," do you mean with respect to the Finch claim or with respect to Covil generally?
A. The Finch claim.

Q. Okay. And what's the basis for your contention that USF&G had the largest share of the coverage?
A. The discussions in the documents about the years of coverage and how much Travelers' share would be of any indemnity versus how they would agree to share in the defense.
Q. That was with respect to primary coverage only, right?
A. Yes.
Q. And when you say "led the defense," what did you mean by that?
A. Just what I said. They were leading the defense. They're the ones who made the decision to change counsel. They're the ones who made the decision to go to trial. They were leading it.
Q. Well, when you say that USF&G was the one that made the decision to change counsel, is it not the case that that was a joint decision by the three insurers that were handling Covil matters at the time?
MR. RASKIN: Object to form.
THE WITNESS: No. I -- I wouldn't agree to that. But, in fact, it was Travelers which instigated, Travelers which insisted on it, and Travelers which pushed it, and the others didn't object. That's what the documents reflect.

I didn't see the other carriers complaining about Dan White's defense. It was Travelers who insisted on moving the cases.

BY MR. TURNER:

Q. Are you offering an opinion that it was inappropriate for the insurers to have replaced the Gallivan, White & Boyd firm with the Wall Templeton firm as trial counsel for Covil on its asbestos-related matters?

A. I believe that it is unreasonable and it was inappropriate for the cases to be moved because the insurers were concerned about having to produce their policies and their coverage information; that it was inappropriate to agree to have a case such as Finch handled by a lawyer who had never tried an asbestos case or a case in federal court; and to fail to reasonably defend their policyholder as the stakes and the exposure got greater on the claim. It was an unreasonable defense.

Q. Well, you understand that Mark Wall was the principal of the Wall Templeton firm who was primarily engaged as counsel for Covil, correct?

A. That is not --

MR. RASKIN: Object to form.

THE WITNESS: -- correct. And the document in

the Finch case indicates what Mr. Silverman said was that he was the lawyer primarily representing Covil in the Finch case, that he was handling it, and then, in fact, he did the trial.

BY MR. TURNER:

Q. Well --

A. There are -- there are no indications that there was significant participation at all on Mr. Wall.

Q. And, in fact, in your report you say that Mr. Wall played only a minor role in the Finch case; is that your --

A. I -- I'm only aware that he was present at trial. I saw one comment. There are -- I did not see any e-mails that he auth- -- authored. I did not see that he appeared in court. I did not see that he communicated directly with plaintiffs or their counsel or that he offered any opinions about that.

Q. Now, you testified earlier in the day that on occasion in your professional career you've reviewed trial transcripts to evaluate the quality of counsel, correct?

A. And for other reasons, yes.

Q. Okay. Now, I noticed on your list of materials reviewed here that you didn't review the trial transcripts of the Finch trial, correct?

A. No. But I asked about -- I asked counsel about it.
Q. Okay. Tell me what you asked counsel about.
A. I asked -- I asked who -- who had handled the case at trial. I asked about Silverman's performance.
Q. And what did they tell you about that?
A. Well, I was quoted various portions of the transcript. And so my overall impression from those discussions is -- and some of the quotes that were provided to me was that I was -- I'm trying to think of a polite term -- I was amazed at the ineptitude of Mr. Silverman.
Q. Do -- do you have a record --
A. You know what the other thing is, is that it does not appear that any of the -- there were no insurance company representatives at the trial.
Q. Okay. Let's stick with your description of what you learned about the trial from Mr. Raskin's firm.
Do I understand correctly that they provided you with a selection of quotes from the trial transcripts?
A. No.
Q. So what exactly did they provide you with?
A. I -- they answered my questions, and then they quoted to me from the record some of the statements

Mr. Silverman had made on the record.
Q. Okay. What -- which quotes specifically did they provide to you?
A. Had to do -- among other things, the one I can recall sitting here right now is how he referred to the opening statement of Jessica Dean, what he said for an opening statement, how he -- after Dean rested, his comments on the record. Things such as that. I don't re- -- that's what I recall sitting here right now.
Q. And was that information and those quotes provided to you in writing or verbally?
A. No. Verbally.
Q. On the telephone?
A. Yes.
Q. Okay. Did you ask to see copies of the trial transcripts and, again, quotes read to you from the transcripts?
A. No.
Q. And -- and who exactly was it that read quotes from the trial transcript to you on the telephone?
A. I'm horrible at names, but Lauren.
MR. TURNER: Mr. Raskin, are you able to provide a last name for us?
MR. RASKIN: McCulloch.
MR. TURNER: I'm sorry. I didn't catch the

last name.
MR. RASKIN: McCulloch, M-c-C-u-l-l-o-c-h.
BY MR. TURNER:
Q. Did you know how Ms. McCulloch had selected those quotations from the transcript to provide to you?
A. No.
Q. And --
A. Answering questions that I asked.
Q. Okay. So you -- you asked her questions about what was said at trial by Mr. Silverman, and she read you some quotes over the telephone?
A. Yes.
Q. And -- and at no time did you ask to see the trial transcripts themselves to evaluate Mr. Silverman's performance?
A. Correct.
Q. Now, what was Mr. Wall's role at the trial, if any?
A. My recollection is -- is that -- I don't know if he had any role whatsoever.
Q. Do you know whether he examined any witnesses at the Finch trial?
A. I recall a reference about that, but I can't recall the specifics right now.
Q. Okay. Do you know how many witnesses Mr. Wall

questioned at the Finch trial?
A. You mean as to cross-examination?
Q. Or examination in chief.
A. I don't know. I don't know.
Q. Do you know, as between Mr. Silverman and Mr. Wall, the respective proportion of the witnesses that they handled at the Finch trial?
A. I don't know.
Q. Do you know whether Mr. Wall handled any arguments or motions during the Finch trial?
A. You mean the pretrial motions?
Q. I'm talking about at trial.
A. No, I don't.
Q. And do you know whether Mr. Wall was present for the entire trial?
A. No, I don't.
Q. Do you know whether he was sitting with Mr. Silverman and able to talk with him about strategy decisions during the course of the trial?
A. No, I do not.
Q. So you really don't have any sense as to the respective roles of Mr. Silverman and Mr. Wall at trial other than the quotes from the transcript that Ms. McCulloch read to you over the telephone?
MR. RASKIN: Object to form.

THE WITNESS: I think the record --
I'm sorry. Go ahead.
MR. RASKIN: It's okay.
Object to form.
THE WITNESS: I think the record speaks for itself. Mr. Silverman said that it was his case, he was primarily handling it, and I have no reason to -- to disagree with that.
BY MR. TURNER:
Q. But you said in the course of your --
A. So --
Q. I'm sorry.
A. Excuse me. I'm not finished.
Q. I apologize. I didn't --
A. Everything that --
Q. -- mean to interrupt.
A. Certainly all the documents and e-mails and letters show that it was Mr. Silverman who was the one who was involved in all the communications, all the negotiations that were going on.
Q. You're aware that the Wall Templeton firm, after they took over the handling of the Covil cases, had some successes, right?
A. Not in the Finch case, but in another case I believe there was a defense verdict. But Mr. Silverman

didn't handle it.
Q. Well, that was the Crawford case where they obtained a defense verdict, right?
A. Yes. It was in another jurisdiction. It was a different defense lawyer and different defendants, so -- and of course a different plaintiff.
Q. Right. And you're aware, also, of the Connor case, I take it.
A. I'm sorry. The what case?
Q. The Connor case.
A. I may have seen a reference to it.
Q. Okay. That was a case in which the Wall Templeton firm won summary judgment, dismissing Covil from the case.
Are you familiar with that?
A. Yes. I mean, you do have the ability to get a defendant out of a case if there is no evidence of exposure to your product or your premises.
In the Finch case that was clearly not the case. From the very beginning all the lawyers were advising it was a bad case, and there was no question that Covil's products were involved and that the plaintiff was going to be able to prove that.
Q. Well, you're aware that there was a pretrial report that was issued by Mr. Silverman to the carriers,

correct?
A. In August, yes.
Q. Okay. And do you recall what the low, medium, and high estimates of potential liability were that were provided by Mr. Silverman and his firm at that time?
A. Yes. I recall the document, and I recall the numbers of 1, 2, and 3 million. I also recall that it is pretty unspecific with regard to those numbers.
It also does not -- it gives a potential for a defense verdict of a pretty low percentage, something like maybe 10 to 20 percent. And it said on some matters there was no defense.
And then, of course, what happened subsequent to that report is that they lost their motion in limine and they lost a motion with regard to the expert report, so -- and everybody else settled. So the circumstances and facts underlying his opinion about the exposure and value of the case changed substantially from when he wrote that at the beginning of August until the time of trial at the beginning of October.
Q. And you've mentioned motions in limine a couple of times now, and you've suggested that Covil lost the motions in limine.
A. Some --
Q. What's your specific recollection about that?

A. There were some that were lost and some that weren't. There's a memo that Silverman wrote where he talked about it being a mixed bag.
Q. Okay. But you're suggesting that --
A. But -- well, the key issue -- the key issue, though, went to what their expert was going to be able to testify to.
Q. So -- so in your opinion, the motions in limina -- limine changed the character of the case?
Is that what you're saying?
A. Increased the exposure to Covil.
Q. You mentioned also that other defendants settled the Finch case, right?
A. That is correct.
Q. Your understanding is, I take it, that -- well, let me rephrase it.
You're aware that any payments made by other defendants for settlement of the Finch case would be counted as a setoff to any judgment against Covil rendered at trial, correct?
A. That's correct. But in this state there is not apportionment of liability. So if they were the only one that went to trial, the jury could assess 80, 90 percent of the liability to Covil.
Q. Okay. Whereas --

receiver.
BY MR. TURNER:
Q. Okay. Well, did the receiver's counsel, for example, ask you to ignore the fact that there was a $32 million verdict in the Finch case?
A. What? No. Nobody's asked me to ignore anything.
Q. And certainly you took that into consideration in forming your opinions in this case, right?
A. I took what into consideration?
Q. The Finch verdict --
A. It doesn't have anything to do with -- with my expert opinion that the way this case was defended on behalf of the policyholder was inappropriate, unreasonable, and unfair to the policyholder.
No. It doesn't affect my opinion. It could have been 5 million. It could have been 6 million. It could have been whatever. That's not the point.
The point is, is that this policyholder was not provided an adequate defense, and the po- -- and the insurers who were involved in its defense did not offer -- did not fairly estimate the exposure to the policyholder and the implications of this case.
Q. Wait. Are you offering the opinion that the insurer did not provide an adequate defense at the Finch

trial?
A. At the trial? No. I'm saying that they did not adequately defend their policyholder by failing to reasonably assess the value of the case and make a reasonable effort to offer their remaining limits to settle the case and to do whatever else they could to convince the plaintiffs' lawyers not to take it to trial.
Q. You're -- you're not offering an opinion that USF&G or Zurich had any fraudulent or wrongful purpose with respect to handling of the Finch claim, are you?
MR. RASKIN: Object to form.
THE WITNESS: One always has to question why a primary carrier lets a potentially huge case go to trial if, in fact, that could result in that carrier exhausting its coverage and, therefore, not having an obligation to provide any more defense.
So I'm not -- I have not seen any documents that refer to that, but it does make one raise that question.
BY MR. TURNER:
Q. Okay. But you haven't seen any evidence that USF&G or Zurich had any fraudulent or wrongful purpose in their handling of the Finch claim, right?
A. Well --

MR. RASKIN: Object to form.

THE WITNESS: I'm sorry.

I am troubled by the comments of the Travelers representatives in the documents about their desire -- I mean, something like to teach Jessica Dean a lesson or to -- you know, to use this case to fight back, to be more litigious. That's inappropriate.

And -- and also the other comments about their insurance coverage. You know, because they didn't know how the insurance coverage would impact the settlement or a verdict, they didn't want to settle the case.

I mean, that's all inappropriate and -- and should not be considered. The only thing that should be considered is what is the appropriate resolution of the claim for the policyholder?

MR. TURNER: Okay. I think I might be done or close to it, so let's briefly go off the record, if that's okay. I'll just check my notes.

And maybe, Matt, you can get ready to pick up.

MR. LITTLE: Yeah. Just give me five minutes. I'm going to go use the bathroom, and then I'll -- I'll get ready.

THE VIDEOGRAPHER: Time now is 4:48 p.m. We

are going off record. This ends Media Unit 2 (sic).

(Recess taken from 4:48 p.m. to 4:57 p.m.)

THE VIDEOGRAPHER: Time now is 4:57 p.m. We are back on record. This begins Media Unit 4.

Please make note for the record that we last went off at 4:48. That was the end of Media Unit 3.

BY MR. TURNER:

Q. Ms. Barber, I -- I think I have just one more question for you. It's about Paragraph 13 of your report. If you could take a look at that, please.

A. (Witness complied.)

Q. Do you have that in front of you?

A. Just a minute. Yes.

Q. In the middle of that paragraph you say this: "When proffered Zurich's $250,000, it was the responsibility of Travelers and Ranger to attempt to resolve the case using the proffered funds."

Do you see that?

A. Yes.

Q. What's the basis for your contention that it was the responsibility of Travelers and Ranger to do that?

A. Because they were -- they were the other carriers who had coverage for Covil. It was a case that had tremendous exposure for Covil, and there is no

indication that an effort was made to resolve the case or to offer what was available in limits.

Q. And in the documents that we've seen previously today it was certainly known and discussed between USF&G and Zurich that Zurich's available limits at that time were $250,000, right?

A. Yes.

Q. And Zurich was involved in the settlement discussions with Finch's counsel directly, right?

A. At one point, yes.

Q. Well, at more than one point, right?

A. Yes.

MR. TURNER: Okay. All right. Subject to other's questions, I think that's all the questions that I have for you now. I appreciate your time and patience with me.

And I think Mr. Little is planning to pick up from here.

CROSS-EXAMINATION

BY MR. LITTLE:

Q. Thank you, Ms. Barber. I'm Matt Little, and I represent Zurich.

I am hopefully not going to take too much of your time, but if any of my questions are unclear, poorly phrased, or in any way confuse you, will you

please let me know?
A. Certainly.
Q. And just as Mr. Turner suggested, there is a little bit of a lag here. I'm going to do my best to listen to all of your answers to my questions. If I interrupt you, I apologize in advance. Please just let me know that I've interrupted you, and I'll stop and let you finish.
Is that acceptable?
A. Certainly.
Q. All right. I'd like you to first look at Exhibit 8 and the second page of Exhibit 8, which was the Zurich subpoena response.
And if you'll look at the very bottom of the page, do you see a reference to Policy Number 41-206393?
A. Is this the subpoena response?
Q. Yes. Yeah, it is.
A. Okay. And you want me to look at what?
Q. The very bottom of the second page.
A. Okay.
Q. And if you'll look at it, it references a $250,000 per-person limit.
Do you see that?
A. I do see that.
Q. All right. And I am going to -- and I think

that's what you were referring to just a moment ago when you referenced Zurich's $250,000 of available coverage during the Finch trial.

Am I correct in my understanding?

A. Well, what I was referring to was what Zurich had said in the -- in the e-mails and documents about their coverage.

Q. Okay.

MR. LITTLE: I am going to try now to introduce an exhibit using this new technology, and I think, if I've gotten the numbers right, it should be Exhibit Number -- no. Hold on a second -- 21.

(Deposition Exhibit 21 was marked.)

BY MR. LITTLE:

Q. All right. Tell me when this shows up on your screen, please, Ms. Barber.

A. 21, joint stipulation?

Q. Yes. This is a document that was filed as a joint stipulation between Zurich and Covil in the Middle District of North Carolina in the case in which you are testifying.

Have you seen this document before today?

A. Yeah. I believe this is the one that I saw recently.

Q. Okay. And if you will please look at the --

it's on -- it's Item Number 2 on Page 2.
A. (Witness complied.) Okay.
Q. Okay.
A. Right.
Q. And that is a reference -- Exhibit B is a reference to the terms and conditions of the policy that we just talked about, correct, the $250,000?
A. Right.
MR. LITTLE: All right. Let me go and look at -- I'm going to introduce another exhibit, and this is going to be now, I believe, 22.
(Deposition Exhibit 22 was marked.)
BY MR. LITTLE:
Q. And if you'll look at -- this is another joint ex- -- or stipulated exhibit between Zurich and Covil and, in this case, also USF&G.
Have you seen this document before today?
A. Hold on. (Witness perused document.)
I don't know if I did see this.
Q. Right. If you will look at Item Number 1, Subsection B. It starts on the first page, and it runs onto the second page.
A. Yeah.
Q. It says, "Zurich Policy #41-206393 with a policy period of March 31, 1973, dash, March 31, 1976.